Dr. Aziz AHMADIEH, Sarah Atteberry, Sam Clay, Dr. John Howard, William Jacobs, Dr. Avis Jorgenson, Dr. Richard Lipp, Larimore Nicholl, Dr. Mildred Powell, Frank Romero, Dr. John Ryan, Dr. Frederick Schaeffer and Dr. John Murphy, Plaintiffs–Appellees,

v.

The STATE BOARD OF AGRICULTURE and The University of Southern Colorado, Defendants–Appellants.

Dr. Aziz AHMADIEH, Sarah Atteberry, Sam Clay, Dr. John Howard, William Jacobs, Dr. Avis Jorgenson, Dr. Richard Lipp, Larimore Nicholl, Dr. Mildred Powell, Frank Romero, Dr. John Ryan, Dr. Frederick Schaeffer and Dr. John Murphy, Plaintiffs–Appellants,

v.

The STATE BOARD OF AGRICULTURE and The University of Southern Colorado, Defendants–Appellees.

Nos. 86CA1437, 87CA0395.

Colorado Court of Appeals, Div. IV.

June 23, 1988.

Rehearing Denied July 21, 1988.

Certiorari Denied Jan. 23, 1989.

Skaalerud & Price, George Price, Gregory J. Lawlor, Douglas J. McGinty, Denver, for plaintiffs-appellees and plaintiffs-appellants.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Lee R. Combs, Charles F. Kaiser, Patrick Garcia, Asst. Attys. Gen., Denver, for defendants-appellants and defendants-appellees.

HUME, Judge.

This case arises from the termination of employment of certain tenured faculty members (plaintiffs) at the University of Southern Colorado (USC) which resulted from a reorganization of academic programs at that institution. Defendants, USC and the State Board of Agriculture (Board), in 86CA1437, appeal the district court's judgment which invalidated the terminations and ordered that plaintiffs be reinstated to their former positions. Plaintiffs appeal the court's denial of their claim for attorney fees under 42 U.S.C. § 1988. We have consolidated the appeals, and now affirm in part and reverse in part.

In 1975, the General Assembly conferred university status upon USC, and directed that it continue to function as a technical community college with authority to award associate degrees. See Colo.Sess.Laws 1975, ch. 200, § 23–55–102 at 744 (repealed Colo.Sess.Laws 1985, ch. 176 § 31.) In 1978, the General Assembly vested general supervisory authority over USC in the Board. See Colo.Sess.Laws 1978, ch. 71, § 23–55–103 at 378.

In 1985, the General Assembly made sweeping amendments to then-existing legislation concerning state funded post-secondary educational institutions. In an effort to eliminate unnecessary duplication of facilities and programs, the Colorado Commission on Higher Education was granted expanded powers and duties with respect to the approval, review, reduction, and discontinuance of programs at all state-supported institutions of higher education. See § 23–1–101, et seq., C.R.S. (1987 Cum. Supp.). In addition, USC's institutional role and mission was redefined as follows:

"[USC] shall be a general baccalaureate and polytechnic institution with moderately selective admission standards. The university shall offer a limited number of professional and engineering technology programs, education programs, and traditional liberal arts and sciences. All two-year programs shall be phased out by July 1, 1987. The university shall offer selective graduate programs compatible with its polytechnic mission which shall be in academic areas which uniquely serve southeastern Colorado." Section 23–55–101, C.R.S. (1987 Cum.Supp.).

Anticipating the legislative redefinition of USC's role and mission, the Board initiated its own program review to determine which programs should be enhanced, maintained, reduced, or eliminated. It hired a new interim president of USC, and directed him to explore means of compliance with the anticipated legislation. After extended study by various task forces within USC, the Board held a two-day public meeting in the spring of 1985, at which the president recommended a number of program changes to the Board, including the elimination of certain courses that, in effect, would eliminate plaintiffs' jobs. At the conclusion of the public meeting, the Board adopted the president's recommendations with minor changes, and approved his proposed list of faculty members whose positions would be eliminated as a result of the change of program.

Each affected faculty member was given notice of the prospective termination, and plaintiffs sought review under the Colorado Higher Education Due Process Act. Section 23–10–101, et seq., C.R.S. (1987 Cum. Supp.). After a hearing, the administrative law judge issued findings and conclusions and determined that all terminations except two were proper, and were the result of a justifiable change in program. See § 23–10–203(1)(d), C.R.S. (1987 Cum.Supp.). He also rejected plaintiffs' argument that the terminations were improper because of the failure of the Board and USC to comply with procedures required by USC's Handbook for Professional Personnel (handbook).

Upon review of the administrative law judge's decision, the Board adopted it except for the determination that two members had been unjustifiably terminated. Accordingly, it sustained all of the terminations originally recommended.

Plaintiffs sought judicial review under § 23–10–202(2)(d), C.R.S. (1987 Cum.Supp.) and § 24–4–106, C.R.S. (1982 Repl.Vol. 10). On review, the district court reversed the Board's decision, concluding that the latter

had erred in failing to follow certain handbook procedures. Specifically, the court held that the failure of the Board to refer its recommended program changes to the university curriculum committee and the faculty senate prior to their adoption violated a provision of the handbook which had been incorporated into plaintiffs' employment contracts, and that this violation had deprived plaintiffs of a property interest (the right to continued employment) without due process of law as guaranteed by the Fourteenth Amendment.

## I.

Defendants contend that the court erred in concluding that section D.14.1 of the handbook should be interpreted so as to mandate reversal of the Board's decision and to require reinstatement of plaintiffs' employment. We agree.

The handbook contains policies and regulations promulgated by the Board for the governance of USC. It is distributed to all faculty members as the university's official policy manual.

Section B.1 of the handbook defines the university's purpose and institutional role in accord with the state master plan of the Colorado Commission on Higher Education, "endorsed by the 1978 Legislature." Other pertinent handbook provisions include the following:

"B.2—The Governing Board—The State Board of Agriculture ... is the legal employer of exempt university employees [faculty and administrative staff] ... and ... the board defines the terms and conditions of employment, which may be set forth in this *Handbook,* or in other documents or resolutions duly adopted by the Board. Changes made by Board action in this *Handbook,* or in any term or condition of employment, or in any policy or resolution affecting the University, shall take effect at the time approved by the Board ... notwithstanding any other provision in this *Handbook;*

. . . .

"C.3.2—Employment Contracts— ... shall include.... (4) a statement that the employee and the State Board of Agriculture are subject to the regulations set forth in ... this *Handbook* as amended from time to time:

. . . .

"D.13—Suspension, Dismissal, Nonrenewal Termination, and Reduction in Force Procedures ... are detailed in the Colorado Higher Education Due Process Act....

. . . .

"D.14.1—Curriculum Development—The responsibility for the initial development of new courses, deletion or changes in existing courses, and the initiation of new programs or program modifications lies primarily with the faculty of each department. All proposals concerning curriculum shall be reviewed and approved or disapproved by the University Curriculum Committee and the Faculty Senate prior to implementation."

It is undisputed that the president's recommendation, made pursuant to the Board's direction, was never referred formally for review and approval or disapproval either to the curriculum committee or the faculty senate. The primary issue presented is whether such referral is, or can be, required by the Board's handbook provisions.

■ Where, as here, handbook regulations purportedly have been incorporated into employment contracts, they must be interpreted under the rules for construction of contracts. *See Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708 (Colo.1987).

■ Interpretation of a written contract is generally a question of law, and contracts must be construed to ascertain and effectuate the parties' intent. *Pepcol Manufacturing Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984). Written contracts that are complete and express the parties' intentions will be enforced according to their plain language, which must be examined and construed in keeping with the plain and generally accepted meaning

of the words used by the parties. *Radiology Professional Corp. v. Trinidad Area Health Ass'n,* 195 Colo. 253, 577 P.2d 748 (1978). Extrinsic evidence of intent is admissible only if the terms of the agreement are ambiguous, and in determining ambiguity, reference must be made to all of the provisions of the agreement. *Radiology Professional Corp. v. Trinidad Area Health Ass'n, supra.*

■ Plaintiffs here contend that the language "all proposals concerning curriculum" at the beginning of the second sentence of section D.14.1 must be construed to include curriculum changes proposed by the Board. We disagree.

Section D.14.1 makes no specific reference to the Board, and it does not expressly require that the Board's proposed program modifications be reviewed by the curriculum committee and the faculty senate prior to implementation. The second sentence must be read in context with the immediately preceding sentence, which places responsibility for course, curriculum, and program development and modification "primarily with the faculty of each department." Thus, in full context, the plain language of D.14.1 only requires faculty-generated proposals to be referred for approval or disapproval, while Board-generated proposals are neither contemplated nor covered by that language.

Moreover, in construing the handbook, we must presume that the Board intended to follow the mandate of the Colorado General Assembly without abdicating its statutorily conferred powers and duties.

The Board's general supervisory authority includes the power to design USC's academic program, subject only to limitations imposed and reservations made by the General Assembly. *See* § 23–1–101, et seq., and § 23–55–101, et seq., C.R.S. (1987 Cum. Supp.). We are unaware of any express legislative authority for the Board's delegation of its authority for program and curriculum development or modification to the faculty, the faculty senate, or the curriculum committee.

If a statute or governmental regulation is susceptible to alternative interpretations, one of which would render the regulation unconstitutional, the interpretation rendering it constitutional must be applied. *Duprey v. Anderson,* 184 Colo. 70, 518 P.2d 807 (1974). Similarly, here, where a handbook prepared by a governmental agency can be read to confer exclusive or ultimate authority upon the faculty senate and the curriculum committee to approve or disapprove program changes contrary to the General Assembly's legislative delegation, or alternatively, can be construed in a manner which avoids unlawful delegation, the latter construction should be favored.

The district court recognized the potential improper delegation problem, but reasoned that the problem could be avoided by construing D.14.1 only to require referral to the faculty senate and the curriculum committee for their advisory approval or disapproval, and to reserve to the Board the ultimate authority delegated to it by the statutes, irrespective of any recommendation the advisory panels might make.

However, the district court's interpretation of D.14.1 ignores the provision that "all proposals concerning curriculum *shall be reviewed and approved or disapproved ... prior to implementation.*" (emphasis added) The word "shall" would require affirmative action by the committee and the senate before *any* curriculum changes could be implemented by the Board. It would permit either body to exercise a pocket veto of Board-proposed curriculum changes and program modification proposals, simply by failing or refusing either to approve or disapprove them. Thus, the district court's construction does not avoid the improper delegation problem.

Accordingly, we conclude that the Board did not intend to vest control over curriculum and program development in the faculty, the faculty senate, or the curriculum committee. Any construction of the handbook's language which inferred such vestment of control would constitute an improper delegation of authority vested by the General Assembly in the Board, and would render such handbook provisions unlawful and void. *See University of Colorado v. Silverman,* 192 Colo. 75, 555 P.2d

1155 (1976); *Big Sandy School District No. 100–J v. Carroll,* 164 Colo. 173, 433 P.2d 325 (1967). *Cf. Fremont RE–1 School District v. Jacobs,* 737 P.2d 816 (Colo.1987). Consequently, no contractual rights of the plaintiffs were violated by the Board's action here.

## II.

The district court, having found a contractual violation, determined that that violation also constituted a violation of plaintiffs' rights to due process of law. Since we have concluded there was no contract violation, and since there is no claim of non-compliance with the Colorado Higher Education Due Process Act, or that that Act does not provide adequate procedural safeguards to protect plaintiffs' Fourteenth Amendment rights, we conclude that the district court erred in reversing the Board's decision on due process grounds. Here, the plaintiffs were given timely notice of the intended terminations, exercised their right to a pretermination hearing, and were provided an opportunity to contest the justifiability of the change in program, and the propriety of their terminations pursuant to § 23–10–203(1)(d), (3), and (4), C.R.S. (1987 Cum.Supp.).

## III.

Our disposition of plaintiffs' claimed contractual and due process violations is also determinative of their claim for attorney fees under 42 U.S.C. § 1988. Having failed to prevail on their claim that defendants deprived them of rights secured by the laws or Constitution of the United States, plaintiffs cannot recover attorney fees.

The district court's judgment invalidating plaintiffs' terminations and ordering their reinstatement is reversed. That portion of the judgment denying plaintiffs' claim for attorney fees is affirmed.

KELLY, C.J., and METZGER, J., concur.