**Eugene W. SAXE, Thomas Lason Altherr, Cindy L. Carlson, Norman E. Pence, David Sullivan, and Colorado Federation of Teachers, Plaintiffs–Appellants,**

v.

**BOARD OF TRUSTEES OF METRO-POLITAN STATE COLLEGE OF DENVER, Defendant–Appellee.**

No. 05CA1251.

Colorado Court of Appeals, Div. III.

March 8, 2007.

Buescher, Goldhammer, Kelman & Dodge, P.C., Joseph M. Goldhammer, Denver, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Fred C. Kuhlwilm, Assistant Attorney General, Denver, Colorado, for Defendant–Appellee.

Christopher Beasley, Denver, Colorado; Robert A. Gorman, Philadelphia, Pennsylvania; David M. Rabban, Austin, Texas, for Amicus Curiae American Association of University Professors, On the Briefs.

Opinion by Judge TAUBMAN.

In this action for declaratory and injunctive relief, plaintiffs, five tenured professors at Metropolitan State College of Denver (Metro State) and the Colorado Federation of Teachers (collectively Professors), appeal the judgment entered following a bench trial, denying one claim and dismissing another against defendant, Board of Trustees of Metro State (Board). We affirm in part, reverse in part, and remand.

## I. Background

This case concerns the impact of the 2003 Handbook for Professional Personnel (2003 Handbook) at Metro State on tenure issues that could arise during reductions in force (RIFs).

At the time of trial, Metro State employed 291 tenured and tenure-track faculty members, and about 600 part-time faculty. Ninety to one hundred faculty members, all of whom received tenure at Metro State before 2003, were members of the Colorado Federation of Teachers.

Metro State was formerly part of the Colorado State Colleges system. In July 2002, the General Assembly made Metro State independent from that system and created the Board as its governing authority. *See* § 23–54–102(1)(b), C.R.S.2006. In 2003, the Board issued the 2003 Handbook, which "supersede[d] any prior version of this Handbook or the State College System Handbook."

### A. Handbook Tenure Provisions

The trial court found the 2003 handbook and its predecessor, the Colorado Handbook for Professional Personnel (1994 Handbook) constituted a part of the contracts of employment between faculty members and Metro State. Although each such faculty member had an employment contract, those contracts are not in the record. The essence of the dispute here concerns the extent to which Metro State may modify the terms of employment through changes to the 1994 handbook.

The glossary in the 1994 Handbook defined tenure to mean:

(1) professional employees who were formerly defined as faculty under Section 23–10–102(4), C.R.S. (repealed 1988) and who completed at least three years of continuous service at one of the State Colleges by the end of the 1987–88 fiscal year; and (2) professional employees who have been awarded tenure by the Trustees may be terminated from the college and department, program area or other similar academic unit in which they are employed only for cause or due to a reduction in force as specified in Sections XI.A. or XII.C. of this Handbook.... Tenure is an award made by the Trustees on the basis of professional employees' performance. Tenure cannot be automatically granted by length of service. Tenure is granted by the Trustees to reinforce the concept of academic freedom as stated in Section III of this Handbook.

The parties agree that a tenured faculty member may be terminated for cause or laid off due to a RIF and that, under certain circumstances, the Board may change provisions within the employment handbook. However, they disagree as to whether certain changes the Board made in the 2003 Handbook are applicable to faculty members who received tenure before that handbook became effective.

The 1994 Handbook identified the grounds for termination and provided, in the event of a RIF, nontenured faculty would be laid off first. 1994 Handbook XI.A.3.a.

The 2003 Handbook did not afford tenured faculty a similar priority over nontenured faculty. Instead, it listed factors the President must consider in making layoff decisions, including tenure, status, years of service, program needs, academic expertise, performance, and teaching record. 2003 Handbook XI.B.1. It further provided that "[t]he primary consideration shall be the maintenance of a sound and balanced educational program." 2003 Handbook XI.B.1.

In addition, the 1994 Handbook stated that, in the event tenured faculty were laid off, "every reasonable effort would be made to relocate individuals in the institution." 1994 Handbook XI.A.3.e. The 2003 Handbook did not require Metro State to make any efforts to relocate dismissed faculty within the institution. 2003 Handbook X.C.

### B. Handbook Hearing Procedures

The two handbooks also contained different hearing procedures in the event a tenured faculty member was dismissed for cause or in a RIF. The 1994 Handbook provided that tenured faculty members could appeal their dismissals through a campus hearing committee and a hearing officer. 1994 Handbook XI.B.4. The campus hearing committee procedure was akin to alternative dispute resolution, in that the committee would attempt to broker an agreement between a faculty member and the President. 1994 Handbook XI.D. 1.c. It further provided, "The campus hearing committee shall make available to the faculty member and to the college president all available pertinent data." 1994 Handbook XI. D.1.c.

If no agreement was reached, the faculty member could proceed to a hearing before a hearing officer. 1994 Handbook XI.D.2.a. The hearing officer would be chosen through a process of elimination by the President and

the faculty member from a list of three officers chosen by the Board. 1994 Handbook XI.D.2.c.

The 2003 Handbook eliminated the hearing committee procedure, but provided for a hearing by a hearing officer chosen by a similar process. 2003 Handbook X.B.6.

No legal standard of review for a hearing officer's decision was specified by the 1994 Handbook, but the 2003 Handbook provided for an "arbitrary and capricious" standard of review. 2003 Handbook X.B.6.

Both handbooks provided that in the event the hearing officer agreed with the faculty member, the hearing officer would prepare a written decision or statement. 1994 Handbook XI.D.2.f.; 2003 Handbook X.B.9. Although the 1994 Handbook required the hearing officer to make findings of fact and conclusions, the 2003 Handbook provided that, in the event the hearing officer agreed with the President's initial decision, the hearing officer "shall, by a simple unelaborated statement, so notify the President and the faculty member." 2003 Handbook X.B.9.

Finally, the 1994 Handbook provided that the hearing officer's determination would be reviewed and action taken by the Board. 1994 Handbook XI.D.3.b. The Board's decision was subject to judicial review as provided by law. 1994 Handbook XI.D.4.b. In contrast, the 2003 Handbook provided the Board "may consult with the President" to determine what action should be taken and "the President's decision is final and is not subject to any complaint or further appeal procedure." 2003 Handbook X.B.9.

### C. Trial Court Proceedings

As relevant here, Professors brought two claims in an action for declaratory and injunctive relief against the Board, alleging the 2003 changes to the handbook (1) breached their employment contract by removing prior substantive and procedural due process rights and protections for continued employment; and (2) denied them procedural due process by limiting the hearing procedures. Professors did not allege that any employment actions had been taken or threatened against individual faculty members based on the 2003 Handbook.

The trial court made extensive findings of fact and conclusions of law. It held there was no breach of contract. However, it concluded, "The President must bear the burden of establishing the ground or grounds for cause set forth in the notice." On appeal, the parties agree with this interpretation of the 2003 Handbook.

The trial court dismissed the due process claim because "the mere possibility that Plaintiffs may be subject to a dismissal for cause or by reduction in force in the future does not constitute an actual controversy." Although on appeal Professors make passing references to dismissals for cause with respect to this claim, they focus primarily on RIFs. Therefore, we will do the same, although our analysis in part III may apply to dismissals for cause.

### II. Breach of Contract Claim for Relief

Professors contend the trial court erred in denying declaratory relief on their first claim because (a) the court adopted Professors' interpretation of the 2003 Handbook related to the burden of proof in a RIF hearing for dismissal and (b) the Board breached the employment contract by taking away a vested property right without due process of law. We conclude the trial court entered a declaratory judgment in favor of Professors on the burden of proof claim without stating so expressly. We further conclude that the case must be remanded to the trial court to determine whether certain provisions of the 2003 Handbook regarding priority and relocation involved Professors' vested rights, and, if so, whether those changes were retrospective.

### A. Declaratory Judgment

The parties dispute the proper standard of review. A trial court's decision to accept jurisdiction to enter a declaratory judgment is a matter we review de novo. *Berenergy Corp. v. Zab, Inc.*, 94 P.3d 1232 (Colo.App.2004), *aff'd*, 136 P.3d 252 (Colo. 2006). Once a trial court has accepted jurisdiction, we review its decision whether to enter a declaratory judgment for an abuse of discretion. *Troelstrup v. Dist. Court*, 712

P.2d 1010 (Colo.1986). Here, the trial court's jurisdiction is not disputed. Therefore, we review the trial court's decision not expressly entering a declaratory judgment for an abuse of discretion.

■ "[A] declaratory judgment is conclusive as to the questions raised by the parties and passed upon by the court." *Atchison v. City of Englewood,* 180 Colo. 407, 414, 506 P.2d 140, 143 (1973). It may be either affirmative or negative in form and effect. Section 13–51–105, C.R.S.2006; C.R.C.P. 57(a); *Bennett's, Inc. v. Krogh,* 115 Colo. 18, 168 P.2d 554 (1946). The better practice is to enter a declaratory judgment even if it is adverse to the plaintiff seeking such judgment. *Bennett's, Inc. v. Krogh, supra; Alameda Water & Sanitation Dist. v. Bancroft Fire Prot. Dist.,* 32 Colo.App. 350, 513 P.2d 728 (1973).

In *Bennett's,* the plaintiff sought a declaration as to the proper interpretation of a contract. The trial court concluded the plaintiff failed to state a claim and granted the defendant's motion to dismiss. On appeal, the Colorado Supreme Court held that "instead of sustaining the motion to dismiss upon determining the issue adverse[ly] to plaintiff, the court should have entered a declaratory judgment in accordance with its ruling on the interpretation of the contract clause involved." *Bennett's, Inc. v. Krogh, supra,* 115 Colo. at 22, 168 P.2d at 556. The court also suggested a losing plaintiff is entitled to the security and relief against uncertainty provided by a declaratory judgment. *Bennett's, Inc. v. Krogh, supra* (citing *Maguire v. Hibernia Sav. & Loan Soc'y,* 23 Cal.2d 719, 146 P.2d 673 (1944)).

■ Here, Professors alleged the Board breached the employment contract by changing the procedure for a dismissal hearing to shift the burden of proof to the faculty member to disprove the reasons for dismissal. On appeal, they seek a declaratory judgment "requiring the president to bear the burden of establishing the grounds for termination stated in the notice of dismissal for tenured faculty members." Although the trial court did not use this specific language or the words "declaratory judgment," it ruled, "The President must bear the burden of establishing the ground or grounds for cause set forth in the notice." This ruling permits no further uncertainty as to the proper burden of the President in dismissal hearings.

Accordingly, we conclude the trial court interpreted the contract essentially as Professors had requested. This interpretation is binding upon the parties. *See S.O.V. v. People in Interest of M.C.,* 914 P.2d 355 (Colo. 1996) (prior court ruling binding on parties through doctrine of res judicata). Further, as noted, the parties agree with the trial court's interpretation of the contract.

Therefore, we make explicit what was implicit in the trial court's ruling—that it entered declaratory relief in Professors' favor on this point.

## B. Breach of Contract

Professors contend the trial court erred in finding there was no breach of contract because, they assert, the 2003 Handbook retrospectively eliminated tenured faculty members' vested rights by (1) removing their priority in the event of dismissals due to RIFs, (2) eliminating their right to alternative employment at Metro State upon such dismissals, (3) dispensing with objective standards for dismissal, and (4) imposing the burden of proof on them in a dismissal hearing. We remand as to the first and second points, disagree as to the third point, and have already resolved the fourth point.

The trial court ruled that the burden of proof cannot rest upon Professors to disprove the stated reasons for dismissal, and, as discussed above, that issue is no longer contested. We therefore address Professors' remaining arguments.

■ We review a trial court's interpretation of a contract de novo. *Cherokee Metro. Dist. v. Simpson,* 148 P.3d 142 (Colo.2006).

### 1. Right to Tenure

The parties agree the employment contract incorporated portions of the employment handbook. In addition, the Board stipulated that each of the contested provisions formed a part of the contract. However, they do not identify which portions were incorporated.

Therefore, we begin our analysis by determining those provisions of tenure that formed a basis of the agreement.

The 1994 Handbook provided that tenured faculty "may be terminated from the college and department, program area or other similar academic unit in which they are employed only for cause or due to a reduction in force as specified in Sections XI.A. or XII.C. of this Handbook." Furthermore, 1994 Handbook IX.B.2.g provided, "[o] nce tenured, faculty members may be involuntarily terminated from the employing colleges and departments, program areas, or academic units only for cause or due to a reduction in force in accordance with Section XI of this Handbook."

■ Therefore, the right to tenure under the 1994 Handbook incorporated by reference Section XI of the Handbook, including the requisite steps to dismiss a tenured faculty member in the event of a RIF. Nevertheless, the Board asserts it had both statutory and contractual authority to modify the employment handbook provisions incorporated into the employment contract. We conclude that to the extent certain tenure provisions in the 1994 Handbook afforded Professors vested rights, the Board did not have statutory or contractual authority to unilaterally modify those provisions or to dismiss Professors.

### 2. Statutory Authority to Modify

■ The governing board of a Colorado university or community college derives its authority to modify an employment handbook from statute, and not, as the Board asserts, from the Colorado Constitution. *Van Pelt v. State Bd. for Cmty. Colls. & Occupational Educ.,* 195 Colo. 316, 323, 577 P.2d 765, 770–71 (1978); *Johnson v. Colo. State Bd. of Agric.,* 15 P.3d 309, 311 (Colo.App.2000); *Ahmadieh v. State Bd. of Agric.,* 767 P.2d 746, 749–50 (Colo.App.1988).

■ Specifically, the Board is statutorily authorized to promulgate bylaws and regulations "for the well-ordering and government" of Metro State "in a manner not repugnant to the constitution and laws of this state." Section 23–54–102(1)(b), C.R.S.2006. Therefore, while the Board may amend faculty handbooks, it may not promulgate bylaws, regulations, or handbooks that are contrary to the Colorado Constitution.

■ The Colorado Constitution provides that "[n]o ... law impairing the obligation of contracts, or retrospective in its operation ... shall be passed by the general assembly." Colo. Const. art. II, § 11. An act is retrospective if (1) it is intended to operate retroactively and (2) it takes away or impairs vested rights acquired under existing laws. *Ficarra v. Dep't of Regulatory Agencies,* 849 P.2d 6, 16 (Colo.1993).

■ Legislation is presumed to operate prospectively unless there is a clear legislative intent to the contrary. *In re Estate of DeWitt,* 54 P.3d 849 (Colo.2002).

■ Here, the 2003 Handbook stated it "supersedes any prior version of this Handbook or the State Colleges System Handbook." In addition, the trial court found portions of the employment handbooks constituted a part of the tenured faculty's employment contracts. Therefore, the intent of the 2003 Handbook was to modify the original employment contract between the faculty and Metro State and to apply it retroactively to Professors. *See City of Golden v. Parker,* 138 P.3d 285, 291 (Colo.2006) (assuming the retroactive intent of the legislation in question).

■ If the legislative body intended the legislation to operate retroactively, we must determine whether the new law impairs a vested right or creates a new obligation, imposes a new duty, or attaches a new disability. *In re Estate of DeWitt, supra.* However, retrospective rulemaking is permitted "where the statute effects a change that is merely *procedural* or remedial in nature." *Johnson v. Colo. State Bd. of Agric., supra,* 15 P.3d at 313.

Therefore, to determine whether the Board retrospectively created new employment handbook provisions, we must determine (1) whether the right to tenure was substantive or procedural and (2) whether it was vested.

### 3. Contractual Authority to Modify

The Board also contends the 1994 Handbook provided contractual authority to modify provisions of the handbook that formed a part of the employment contract. We need not resolve this contention in the context of this appeal.

The 1994 Handbook described the general policy of employment contracts as follows: "All institutions shall use a uniform contract form setting forth the general conditions for employment applicable to all professional personnel and specifying that the employee and the trustees are subject to regulations set forth in this Handbook *as amended from time to time* " (emphasis added).

In *Ferrera v. Nielsen*, 799 P.2d 458, 460 (Colo.App.1990), a division of this court held that an employer impliedly reserves the right to modify an employment handbook.

In that case, Ferrera argued the employer breached an implied employment contract applicable to otherwise at-will employees by not following discharge policies outlined in a former employment handbook. The division held employers reserve the right to modify employment handbooks, and the former handbook, from which the prior discharge policies had been eliminated, did not create an implied contract limiting the employer's right to terminate employees. The *Ferrera* division, however, did not address the issue presented here, which is the limits of such modifications.

Because no other Colorado case has determined whether an employer may reserve the right unilaterally to modify provisions of an employment handbook that the employee believes are central to the terms of employment, we look to the law in other jurisdictions.

The majority of jurisdictions addressing this issue have held that an employer may modify an employment policy after a reasonable time if it provides reasonable notice and does not interfere with vested employee benefits. *See Asmus v. Pac. Bell,* 23 Cal.4th 1, 96 Cal.Rptr.2d 179, 999 P.2d 71, 76 (2000)(collecting cases). These cases reason the employer may modify a contract unilaterally because the employer created the con-

tract unilaterally. *Asmus v. Pac. Bell, supra.*

A minority of jurisdictions have held an employer may not modify the terms of an employment handbook that forms the basis of an employment contract without a formal offer, acceptance, and additional consideration. *See, e.g., Demasse v. ITT Corp.,* 194 Ariz. 500, 984 P.2d 1138, 1144 (1999). We need not resolve whether an employer may reserve the right to change any provision within an employment handbook without notice or consideration because even courts endorsing unilateral modification of an employment handbook have held that an employer may not abrogate an employee's vested benefits. *See, e.g., Asmus v. Pac. Bell, supra,* 96 Cal.Rptr.2d 179, 999 P.2d at 79; *see also* Brian T. Kohn, Note, *Contracts of Convenience: Preventing Employers from Unilaterally Modifying Promises Made in Employee Handbooks,* 24 Cardozo L.Rev. 799 (2003); Stephen Carey Sullivan, Comment, *Unilateral Modification of Employee Handbooks: A Contractual Analysis,* 5 Regent U.L.Rev. 261 (1995).

Because this case presents a controversy over public employment and a question whether the provisions of the 2003 Handbook are unconstitutionally retrospective, we will assume that Professors' rights, if vested, are protected at least to the extent that vested benefits are protected in the private sector.

Therefore, the Board's ability to modify the 1994 Handbook under either its statutory or contractual authority depends on whether Professors' right to tenure was vested and involved substantive, rather than procedural rights. We address these questions in turn.

### 4. Substantive Versus Procedural Rights

■ We now consider whether the 2003 changes took away substantive rights or procedural remedies. We conclude that the priority and relocation provisions involved substantive rights, but that the remaining changes were procedural.

■ "The distinction between substantive and remedial statutes lies in the fact that substantive statutes create, eliminate, or modify vested rights or liabilities, while pro-

cedural statutes relate only to remedies or modes of procedure to enforce such rights or liabilities." *Shell W. E & P, Inc. v. Dolores County Bd. of Comm'rs*, 948 P.2d 1002, 1012 (Colo.1997).

### a. Priority and Relocation

■ The trial court held that evidence of custom and usage in the interpretation of tenured contracts in higher education was admissible to interpret the 2003 Handbook. We agree that this evidence was proper.

■ "Even if a term is not facially ambiguous, evidence of industry standards may be used to demonstrate the parties' intent." *See Employment Television Enters., LLC v. Barocas*, 100 P.3d 37, 42 (Colo. App.2004). "Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is." *Browzin v. Catholic Univ.*, 527 F.2d 843, 848 (D.C.Cir.1975) (quoting *Greene v. Howard Univ.*, 412 F.2d 1128, 1135 (D.C.Cir.1969)).

Therefore, to distinguish between substantive and procedural aspects of tenure under the 1994 Handbook, we examine the expert testimony and exhibits introduced at trial as to industry standards.

The trial court qualified Professor Matthew Finkin as an expert in the practices, customs, usages, and norms of tenure in higher education in the United States. He testified that removing the priority and relocation provisions did not comport with the norms and usages of higher educational institutions. He cited to the American Association of University Professors (AAUP) 1925 Conference Statement on Academic Freedom and Tenure, which provides:

> Termination of permanent or long-term appointments because of financial exigencies should be sought only as a last resort, after every effort has been made to meet the need in other ways and to find for the teacher other employment in the institution. Situations which make drastic retrenchment of this sort necessary should preclude expansions of the staff at other points at the same time, except in extraordinary circumstances.

*Browzin v. Catholic Univ., supra*, 527 F.2d at 847 (quoting AAUP 1925 Statement).

The trial court admitted as evidence the Association of American Colleges 1971 Statement on Financial Exigency and Staff Reduction, which provides in relevant part, "Tenured members of the faculty should normally be retained in preference to probationary appointees."

In addition, Professor Finkin testified,

> The well understood meaning of tenure in American higher education now for over 60 years . . . has been that tenure means that you will be terminated only as a genuine last resort, [and] that all other avenues including terminations of those who do no enjoy [tenure] status must be exhausted first.

He further testified that removal of priority in the 2003 Handbook "eviscerates tenure": "Tenure now becomes meaningless."

The Board presented no evidence of industry custom and usage.

Furthermore, the employment handbooks describe the process by which tenure is earned. Faculty members pursue tenure through a multiyear process and must apply for the privilege of tenure, which is granted based on teaching, advising, professional development, and service. Before earning tenure, however, fulltime, tenure-track faculty are probationary employees subject to nonrenewal. On receiving tenure, faculty members are no longer probationary employees and, therefore, obtain greater job security.

If tenured faculty would lose their priority or right to relocation in the event of layoff decisions, they would effectively be relegated to the status of nontenured faculty.

Therefore, the rights to priority and relocation cannot be characterized as procedural. These rights lie at the heart of the concept of tenure because tenure provides job security and, thereby encourages academic freedom. The loss of that job security in the event of a RIF would strip tenure of its very substance.

The Board, nonetheless, argues that *Brenna v. Southern Colorado State College*, 589

F.2d 475 (10th Cir.1978), suggests a contrary result. We disagree.

In that case, the Tenth Circuit held that a college did not violate a tenured professor's right to substantive due process by dismissing him while retaining a nontenured faculty member. However, that case is both factually and legally distinguishable. The employment contract in *Brenna* "made no provisions for the method of selecting persons to be terminated." *Brenna, supra,* 589 F.2d at 477. Here, the 1994 Handbook contained numerous such provisions.

Furthermore, the *Brenna* decision was based upon the plaintiff's substantive due process claim, and the federal court did not address the contractual claim: "It is not necessary for us to resolve this issue, which essentially is a matter of simple contract law for state court interpretation." *Brenna, supra,* 589 F.2d at 477.

Therefore, *Brenna* is not persuasive. We conclude the rights to priority and relocation are essential to the contractual right to tenure and therefore are substantive in nature.

### b. Standards, Access to Information, and Written Explanation

■■■ Professors also contend the 2003 Handbook takes away substantive rights because it lacks discernable standards, the hearing process unfairly limits access to information, and there is no right to a written explanation of a termination decision. We conclude these are procedural remedies rather than substantive rights.

The 1994 Handbook provided a comprehensive process to rank both tenured and nontenured faculty, with reductions to occur first from the nontenured list in the order of ranking. 1994 Handbook XI.A.3. The 2003 Handbook removed this systematic process and required, instead, that consideration be given to "tenure status, years of service to the college, program needs, academic expertise, performance, teaching record, and other relevant factors." 2003 Handbook X.B. 1.

The former process of ranking within tenured and nontenured groups under the 1994 Handbook does not involve a substantive right. Because we have already ruled that tenured faculty have priority over nontenured faculty, the process by which the Board decides to lay off faculty is procedural. The decision to dismiss one tenured professor over another or to dismiss one untenured professor over another will not destroy the right to tenure.

In addition, the right to "all relevant information" as provided by the 1994 Handbook was not substantive. Although the 2003 Handbook allowed access only to "all public information," the right to information in an administrative hearing is procedural. Furthermore, Professors have no right to confidential information in an administrative proceeding. *See Garner v. Colo. State Dep't of Pers.,* 835 P.2d 527 (Colo.App.1992).

Finally, the right to a written decision is procedural, not substantive. *Cf. Mau v. E.P.H. Corp.,* 638 P.2d 777 (Colo.1981).

Accordingly, we conclude the remaining changes to the 2003 Handbook were procedural and, therefore, do not support Professors' breach of contract claim.

### 5. Vested Right to Tenure

We next determine whether and to what extent Professors possessed a vested right to tenure as defined in the 1994 Handbook. The trial court did not address whether the priority and relocation provisions of the 1994 Handbook created a vested right for Professors. Therefore, we remand for the trial court to make this determination.

■■■ "A vested right 'must be a contract right, a property right, or a right arising from a transaction in the nature of a contract which has become perfected to the degree that it is not dependent on the continued existence of the statute' or common law." *City of Golden v. Parker, supra,* 138 P.3d at 293 (quoting 1A Norman J. Singer, *Sutherland Statutory Construction* § 23.35 (6th ed.2002)).

■■■ Here, the right to tenure was provided by the 1994 Handbook and is deemed vested if it satisfies a three-factor test: "(1) whether the public interest is advanced or retarded; (2) whether the statute gives effect to or defeats the bona fide intentions or

reasonable expectations of the affected individuals; and (3) whether the statute surprises individuals who have relied on a contrary law." *City of Golden v. Parker, supra,* 138 P.3d at 290 (quoting *In re Estate of DeWitt, supra,* 54 P.3d at 855).

### a. Public Interest

Here, countervailing public interests are at stake. Professors rely on the public interest in protecting academic freedom through tenure, while the Board asserts a public interest in providing maximum flexibility in faculty layoff decisions, particularly for Metro State, which provides only undergraduate education.

 The 1994 Handbook provides that "(t)enure is granted by the Trustees to reinforce the concept of academic freedom as stated in Section III of this Handbook." The United States Supreme Court explained the importance of academic freedom:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.
> . . .
> Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211–12, 1 L.Ed.2d 1311 (1957). Furthermore, tenure is designed to eliminate the chilling effect that the threat of discretionary dismissal casts over academic pursuits. *Browzin v. Catholic Univ., supra.*

If the tenure system were to be weakened by undermining its purpose of ensuring and protecting employment security, so too would the important public interest of academic freedom be diminished.

Here, tenure serves to protect academic freedom by ensuring tenured faculty will not fear reprisals on account of their academic pursuits in the guise of economic layoffs. Professors provided substantial evidence to support this assertion.

However, the Board supported the countervailing public interest in allowing it flexibility in making staffing decisions with testimony of Raymond Keefe, the interim president of Metro State. At trial, he testified that because Metro State serves a highly diverse student population, it relies on part-time and adjunct faculty. Metro State, he explained, would have to diminish significantly its course offerings if it could not retain flexibility in the hiring of part-time and adjunct faculty and, implicitly, laying off tenured faculty.

We conclude that on remand the trial court must weigh these competing public interests.

### b. Reasonable Expectations and Reliance

As noted, the second and third parts of the vested rights test are whether the statute gives effect to or defeats the bona fide intentions or reasonable expectations of the affected individuals and whether the statute surprises individuals who have relied on a contrary law. Because there are no factual findings on these issues, we remand to the trial court to address them.

Here, neither party introduced evidence as to the reasonable expectations of the parties in entering into the contract. Although Professor Finkin testified as to the academic community's general understanding of the concept of tenure, he did not testify as to the Professors' specific reasonable expectations nor as to whether they reasonably relied upon provisions of the 1994 Handbook. Further, Metro State did not present evidence on this point.

 Therefore, on remand, the trial court should make findings as to the reasonable expectations of the parties and whether Professors reasonably relied upon the priority and relocation tenure provisions of the 1994 Handbook. In applying the three-part vested rights test, the trial court should make this determination based on the existing record.

### III. Procedural Due Process Claim for Relief

Professors contend the trial court erred by dismissing the due process claim, arguing it was ripe for adjudication and, as to its substance, several provisions of the 2003 Handbook violated their right to procedural due process under the Colorado Constitution. We agree in part.

#### A. Ripeness

Professors contend the due process claim presented a controversy that was ripe for adjudication in a declaratory judgment action. We agree.

A court may consider a declaratory judgment action either before or after the contract has been breached. Section 13–51–107; C.R.C.P. 57(c). To eliminate uncertainty, the declaratory judgment statute must be liberally construed and administered. *See* § 13–51–102, C.R.S.2006; *Bd. of Educ. v. Booth,* 984 P.2d 639 (Colo.1999) (addressing plaintiffs' declaratory judgment claim challenging administrative procedure's constitutionality because plaintiffs faced substantial uncertainty). Furthermore, Colorado's appellate courts have considered several declaratory judgment actions concerning employment contracts prior to a breach. *See Bordahl v. Caldwell,* 111 Colo. 585, 144 P.2d 780 (1944); *Johnson v. Colo. State Bd. of Agric., supra.* Therefore, we conclude there was a controversy, and the issue was ripe for judicial review.

The trial court ruled that Professors' due process claim did not sufficiently allege a controversy because "the mere possibility that Plaintiffs may be subject to a dismissal for cause or by reduction in force in the future does not constitute an actual controversy."

In support, the court cited *Burcham v. Burcham,* 1 P.3d 756 (Colo.App.2000). In that case, the plaintiff sought a declaratory judgment that he would be the executor of a will. The division noted that a will takes effect only upon the testator's death and because the testator was still alive, the interpretation of the will did not provide a controversy ripe for review.

Here, Professors already work under the employment contract. They entered into the contract in reliance upon the terms stated in the contract and face substantial uncertainty as to the terms of the contract. Therefore, the trial court abused its discretion in dismissing Professors' due process claim based on ripeness.

#### B. Procedural Due Process

Professors contend the Board violated their right to procedural due process under the Colorado Constitution by (1) providing the President with final authority to dismiss a tenured faculty member even though the President is not an impartial decision-maker; (2) eliminating the hearing officer's duty of issuing an explanatory, written decision when the hearing officer agrees with the President's initial decision to lay off a faculty member; and (3) shifting the burden of proof. We agree as to point one, disagree as to point two, and we do not address point three because it is resolved by our conclusion in part II.A above.

Facial challenges, such as this, must be rejected unless there is no set of circumstances in which the statute or, in this case, handbook, can constitutionally be applied. *Bd. of Educ. v. Booth, supra.* The plaintiff has the burden to prove the challenged procedures are unconstitutional beyond a reasonable doubt. *Bd. of Educ. v. Booth, supra.*

No person shall be deprived of life, liberty, or property, without due process of law. Colo. Const. art. II, § 25. In the context of an administrative hearing, "It is an elementary axiom of procedural due process that where significant rights are at issue, the decision-maker must state the reasons for his determination." *Mau v. E.P.H. Corp., supra,* 638 P.2d at 780 (citing *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). Furthermore, procedural due process in the context of an administrative hearing includes at a minimum, "the right to a written statement by the hearing officer setting forth the reasons for the disciplinary action and the evidence relied upon." *Mariani v. Colo. Dep't of Corr.,* 956 P.2d 625, 628

(Colo.App.1997) (citing *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)); *see also Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972) (the minimum requirements of procedural due process include: (a) written notice of the claimed violations; (b) disclosure of evidence against the responding party; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body, members of which need not be judicial officers or lawyers; and (f)a written statement by the fact finders as to the evidence relied on and the reasons supporting the decision).

### 1. President's Authority

Here, the 2003 Handbook's indication that "the President's decision is final" should not be construed to limit a tenured faculty member's right to judicial review of a dismissal decision. *See* § 24–4–106(2), C.R.S.2006 ("Final agency action under this or any other law shall be subject to judicial review. . . .").

In addition, "[a]n adjudicatory hearing will be held to have been conducted impartially in the absence of a personal, financial, or official stake in the decision evidencing a conflict of interest on the part of a decision maker." *Mountain States Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 763 P.2d 1020, 1028 (Colo.1988) (citing *Soon Yee Scott v. City of Englewood*, 672 P.2d 225, 228 (Colo.App.1983)). However, an administrative hearing officer may not review his or her own action. *Tepley v. Pub. Employees Retirement Ass'n*, 955 P.2d 573, 577 (Colo.App. 1997).

In *Tepley,* the plaintiff applied for disability retirement benefits with the Public Employees Retirement Association (PERA). The PERA board reviewing the application initially denied it, and Tepley sought reconsideration. The same board then held an evidentiary hearing, made factual findings and conclusions of law, and rejected Tepley's application.

A division of this court held that the board had improperly prejudged Tepley's application because the final decision was made by the same members of the board who had initially denied the application. *Tepley v. PERA, supra* (citing *State Comp. Ins. Fund v. Fulkerson,* 680 P.2d 1325 (Colo.App.1984)).

Here, the 2003 handbook provides that the President may initiate a dismissal proceeding and also gives the President authority to make the final decision of termination. Although a faculty member may contest the President's initial recommendation of dismissal in front of an impartial hearing officer, the hearing officer has no authority to make layoff decisions. A hearing officer makes a recommendation to the President, but the President accepts or rejects the hearing officer's recommendation pursuant to the 2003 Handbook. Therefore, this procedure improperly permits the President to both initiate and resolve a dismissal and, therefore, denies Professors' right to procedural due process.

### 2. Written Decision

Finally, both the 1994 Handbook and the 2003 Handbook require the hearing officer to make findings of fact and conclusions of law. However, the 2003 Handbook created a dual standard in this regard. Where the hearing officer finds the faculty member did not establish his or her contention, the officer is required to write "a simple unelaborated statement." In contrast, if the hearing officer finds the faculty member established his or her contention, the officer is required to provide a "written statement that includes a recommendation for action."

Although, "a simple unelaborated statement" could be interpreted to permit a hearing officer to issue a decision that does not satisfy the constitutional requirements of procedural due process, we must determine here whether all possible applications of the provision would be unconstitutional. We conclude that, to be constitutional, the "simple unelaborate statement" standard requires the hearing officer to issue a decision stating, at a minimum, the reasons for that decision and the evidence relied upon. *See Mariani v. Colo. Dep't of Corr., supra.* So construed,

this provision does not violate Professors' right to procedural due process.

## IV. Conclusion

The judgment is reversed to the extent the trial court held that the President's decision of dismissal is final and to the extent the trial court denied Professors' claims regarding their tenure rights to priority and relocation. The case is remanded to the trial court for further proceedings consistent with this opinion, including proceedings to determine whether the 1994 Handbook tenure provisions regarding priority and relocation created vested rights for Professors and, therefore, whether the 2003 Handbook tenure provisions were retrospective. The trial court should make this determination based on the existing record. The judgment, including our interpretation regarding the President's burden of proof and the requirements for a written statement, is otherwise affirmed.

Judge WEBB and Judge ROMÁN concur.