Monaco v New York Univ. (2022 NY Slip Op 01125)





Monaco v New York Univ.


2022 NY Slip Op 01125


Decided on February 22, 2022


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 22, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Judith Gische
Cynthia S. Kern David Friedman Jeffrey K. Oing Anil C. Singh


Index No. 100738/14 Appeal No. 15034 Case No. 2021-00792 

[*1]Dr. Marie Monaco et al,, Plaintiffs-Appellants,
v
New York University et al., Defendants-Respondents. Mark Barenberg, Isidor and Seville Sulzbacher Professors of Law, Columbia Law School, Helen Bender, Associate Professor of Law, Fordham University School of Law, Cynthia Grant Bowman, Dorothea S. Clarke Professor of Law, Cornell Law School, James Brudney, Joseph Crowley Chair in Labor and Employment Law, Fordham University School of Law, Matthew Dimick, Professor of Law, University at Buffalo School of Law, Cynthia Estlund, Catherine A. Rein, Professor of Law, New York University Law, Philip Hamburger, Maurice & Hilda Friedman, Professor of Law, Columbia Law School, Robert Hillman, Edwin H. Woodruff, Professor of Law, Emeritus, Cornell Law School, Arthur Leonard, Robert F. Wagner, Professor of Labor and Employment Law, New York Law School, Carlin Meyer, Professor of Law, Emerita, New York Law School, Liam Murphy, Herbert Peterfreund, Professor of Law, New York University Law, Norman S. Poser, Professor of Law, Emeritus, Brooklyn Law School, Samuel Weinstein, Associate Professor of Law, Cardozo Law, Amici Curiae.



Plaintiffs appeal from an order of the Supreme Court, New York County (Francis A. Kahn, III, J.), entered November 23, 2020, which, insofar as appealed from, granted defendants' motion for summary judgment dismissing the complaint.




Gladstein, Reif & Meginniss, LLP, New York (Katherine H. Hansen, Beth M. Margolis and Jessica E. Harris of counsel), for appellants.
Kelley Drye & Warren, LLP, New York (Barbara E. Hoey and Damon W. Suden of counsel), for respondents.
Bantle & Levy LLP, New York (Robert L. Levy of counsel), for amici curiae.



OING, J. 


We are asked to decide a novel issue — whether "economic security" guaranteed to tenured professors protects them from the imposition of a policy mandating a salary reduction if they fail to obtain sufficient grants to fulfill their extramural funding goals. The implication of our decision on the issue is clear — it would affect the meaning of and rights associated with academic tenure. The resolution of this issue involves a nationally and internationally leading academic and research institution — New York University (NYU).
We begin our analysis with the concept of academic tenure, which has its genesis in a 1940 Statement of Principles on Academic Freedom and Tenure (1940 Statement), drafted jointly by the American Association of University Professors (AAUP)[FN1] and the Association of American Colleges (AAC). The 1940 Statement defines the rights and responsibilities associated with tenure, including the right to "permanent or continuous" employment and the right to "academic freedom" and "economic security". In 1948, NYU's Board of Trustees authorized the adoption of the 1940 Statement, incorporating it into the university's Faculty Handbook. As is relevant herein, Title I of the Faculty Handbook (issued April 2014), entitled "Statement in Regard to Academic Freedom and Tenure" (Academic Tenure Statement), provides, in relevant part:
"I. Authorization by the Board of Trustees [footnote omitted]
The Board of Trustees of New York University has authorized the following statement in regard to academic freedom and tenure at New York University. It reserves the right to amend this statement at its discretion, but no amendment shall take away a status of permanent or continuous tenure acquired before such amendment.
"II. The Case for Academic Freedom
Academic Freedom is essential to the free search for truth and its free expression. Freedom in research is fundamental to the advancement of truth. Freedom in teaching is fundamental for the protection of the rights of the teacher in teaching and of the student in learning. Academic freedom imposes distinct obligations on the teacher such as those mentioned hereinafter.
"III. The Case for Academic Tenure
Academic tenure is a means to certain ends, specifically: (1) freedom of teaching and research; and (2) a sufficient degree of economic security to make the profession of teaching attractive to men and women of ability."
Individual schools and colleges [*2]within NYU may promulgate their own policies; those may supplement but not supersede or replace the rights set forth in the Faculty Handbook.
Plaintiff Professor Herbert Samuels received his medical degree from defendant New York University School of Medicine in 1965.[FN2] NYU hired him in 1970 as an assistant professor of medicine, promoted him to associate professor in 1975, and awarded him tenure and promoted him to full professor in 1977. During his tenure at NYU, Professor Samuels has served in numerous high-level administrative positions, published extensively, served on journal editorial boards and as a grant reviewer for the National Institutes of Health (NIH), received many nationally and internationally recognized honors and awards, and was awarded millions of dollars in external grants.
Plaintiff Professor Marie Monaco received her Ph.D. in biochemistry from Columbia University. NYU hired her in 1980 as an assistant professor of physiology and biophysics, and awarded her tenure and promoted her to associate professor in 1987. Professor Monaco has published extensively, served as a grant reviewer for the NIH, the National Science Foundation, and the Department of Defense, led curriculum development, devoted many hours to service on faculty governance bodies, and was awarded millions of dollars in external grants. Professor Monaco has also served as Secretary and President of the NYU Chapter of the American Association of University Professors. Like that of other faculty members, Professors Samuels's and Monaco's employment at NYU has always been subject to the terms of the Faculty Handbook.
In May 2001, NYU offered Professor Samuels the position of Chairman of its Department of Pharmacology. The initial appointment letter provided no salary guarantee.[FN3] Professor Samuels rejected it. NYU then provided Professor Samuels with another appointment letter.[FN4] That letter set forth a "compensation package" indicating a specific salary and conditional benefits (final appointment letter). It was in contrast to the initial version, which merely proposed a salary tied to certain conditions. Neither letter contained a durational term. Professor Samuels agreed to the terms of the final appointment letter and accepted it. Although receiving two appointment letters and a tenure letter during her association with NYU, Professor Monaco never had letters of this kind, i.e., specifying a salary level or amount for an indefinite time.
On November 3, 2009, NYU promulgated a new salary policy for its research faculty, known as the "Policy on Performance Expectations" or "Required Extramural Funding" policy (REF Policy), which took effect in 2010. The purpose of the policy was to define realistic expectations for research faculty productivity and teaching obligations. To that end, the policy provides a standardized approach to evaluating faculty for merit increases, salary adjustments, and incentive rewards. As to salary adjustments, the policy permits NYU School [*3]of Medicine to require faculty to secure extramural funding to cover 60% of their research salaries. A faculty member's failure to obtain at least 20% of his or her salary in grants for two years could result in a salary reduction of 20% each year. The policy allows for the gradual reduction of a faculty member's salary when the member has failed to meet the newly required performance expectations, but the salary cannot be reduced to a level below a base salary.
Sometime in 2012, NYU eliminated the Department of Pharmacology by merging the Departments of Biochemistry and Pharmacology into a new Department of Biochemistry and Molecular Pharmacology. As a result of this departmental restructuring, Professor Samuels's position as Chairman of the Pharmacology Department was eliminated. NYU offered him the position of Vice Chair of Education in the new department in an appointment letter that, by its terms, would "supersede and merge all prior proposals, understandings and other agreements, oral and written, relating to your employment." Critically, this new appointment letter would have subjected Professor Samuels to the REF Policy. Professor Samuels refused to sign it. Instead, he returned to his tenured faculty position and, pursuant to the terms of the final appointment letter, was paid a salary of $285,151 for the 2012-2013 academic year, which was equivalent to his pay in 2001, adjusted for inflation. His salary for 2013-2014 was nearly identical.
In November 2013, NYU informed Professor Samuels for the first time that he was subject to the REF Policy, and in around April 2014 informed him that, for the 2012-2013 academic year, he had secured grants amounting to only 0.4% of his salary —
far less than the REF Policy's 60% requirement. Accordingly, effective September 1, 2014, NYU reduced his salary by $11,286. NYU reduced Professor Samuels's salary each year thereafter through the 2019-2020 academic year, by which point his salary had been reduced from $285,151 to $179,630. The salary reductions had a corresponding negative effect on the value of his pension. Similarly, NYU informed Professor Monaco in March 2014 that, pursuant to the REF Policy, because she had failed to meet her 60% requirement, effective September 1, 2014, her salary would be reduced from $167,646 to $161,611. Professor Monaco's salary was reduced each year thereafter through the 2019-2020 academic year, by which point her salary had been reduced to $120,643.
In 2014, Professors Samuels and Monaco commenced a hybrid CPLR article 78 proceeding and plenary action challenging their salary reductions. Their two article 78 claims alleged that NYU failed to comply with its policies and procedures in promulgating the REF Policy and that, even if that policy was valid and lawful, NYU applied it arbitrarily and capriciously insofar as NYU did not apply the policy equally to all faculty consistent with the policy's terms. The Professors' two plenary action claims alleged breach of contract [*4]and promissory estoppel. Supreme Court granted NYU's motion to dismiss the hybrid proceeding. On appeal, this Court only reinstated the claims for breach of contract and promissory estoppel (see Matter of Monaco v New York Univ., 145 AD3d 567 [1st Dept 2016]). Following several years of discovery, including expert discovery, NYU moved for summary judgment dismissing the complaint, and Professors Samuels and Monaco moved for summary judgment on their breach of contract claims.
Supreme Court granted NYU's motion and denied Professors Samuels and Monaco's motion. It determined that NYU did not breach the Academic Tenure Statement's "economic security" provision when it reduced the Professors' salaries pursuant to the REF Policy, because the phrase "economic security" was "merely a general preamble to the description of tenure and the related policies." The court found that even if it were not merely "'introductory'" and in fact "created contractual obligations," the Academic Tenure Statement did not set forth any language prohibiting NYU from implementing the REF Policy and imposing the policy's extramural funding requirements on tenured members of the faculty, including Professors Samuels and Monaco. As to the claim based on Professor Samuels's "2001 Contract," i.e., the final appointment letter, the court dismissed the claim because the "2001 Contract" was "not an indefinite and unrestricted salary guarantee," and "did not intend to exclude Samuels from any type of salary reductions." The court found that the contractual claim based on NYU's failure to abide by the disciplinary process in reducing the Professors' salary was not tenable because NYU's salary reductions in accordance with the REF Policy were not for disciplinary purposes because no disciplinary rule was violated when the Professors failed to meet the REF Policy's extramural funding goals. This appeal ensued.[FN5]
Our analysis of the contract claim based on the Faculty Handbook necessarily begins with the Professors' argument that the term "economic security" found in the Faculty Handbook is ambiguous and that the following evidence could lead a reasonable factfinder to conclude that the term is understood in academia as prohibiting salary reductions for tenured faculty:
"The drafters of the 1940 Statement analogized the economic security
required to protect faculty's academic freedom to that accorded federal
judges under Article III of the Constitution—who, absent serious
misconduct, also hold lifetime tenure and cannot have their salaries reduced;
"Academic freedom 'depends upon the ability of the university to make its
staff absolutely independent of private remuneration or subvention';
"Academics, including Allan Cartter, former Chancellor and Executive Vice President of NYU, have long agreed that tenured salaries are fixed costs that cannot be reduced;
"The AAMC, 'the nation's most authoritative voice on faculty compensation practices in American medical schools,' has repeatedly [*5]stated that historically, '[i]t was assumed that tenure guaranteed the total salary of basic scientists'"
(citations omitted). They also point to the testimony of their expert, Professor Matthew Finkin, who explained that:
"the economic security that tenure guarantees is that the tenured faculty will not have his or her salary reduced involuntarily except for financial exigency or as a sanction, imposed after hearing, for serious misconduct that does not warrant dismissal."
The Professors argue further that reliance on external funding from private and governmental entities is anathema to the stated purpose of the Academic Tenure Statement:
"'The clearest danger is that investigators who receive corporate funding for their research may be influenced in ways that favor the industry . . . Having received such support . . . they may be subtly affected when they decide how strongly to word a conclusion, how much to emphasize possible qualifications and contrary interpretations, or whether to mention potential (but unproven) new risks.'
. . .
"'[T]he federal government has become far more desirous of supporting research with foreseeable practical application than it has the search for 'useless knowledge.' It is the latter, however, research not conducted for some immediate pay-off nor having any immediately discernible practical application that . . . can have the most impact in the long run.'"
(citations omitted). The Professors also point out that NYU's own documents make clear that when NYU previously wanted to reduce tenured faculty salaries it had the faculty enter into agreements explicitly permitting such reductions. They argue that those agreements would have been unnecessary if NYU had the unilateral right to make the reductions.
In support of the Professors' arguments, amici curiae focus on what a court should consider in deciding the ambiguity issue. Notably, they contend that Supreme Court's finding is untenable because it relied on inapposite case law, namely, the law governing "bargained-for commercial transactions," rather than the body of authority concerning academic custom or usage, which they claim has special salience when considering rules governing the terms and conditions of faculty employment. Amici curiae maintain that the "words these policies use draw meaning from how they are understood by those accustomed to use them in the academic world and are to be interpreted in accordance with the purposes they serve."
The problem with the above arguments is that both the Professors and amici curiae improperly seek to give meaning to a term that is prefatory, rather than using a defined term to give meaning to clauses elsewhere in the Faculty Handbook (see Ellington v EMI Music, Inc., 24 NY3d 239 [2014] [relying on definitions contained in preamble]). The phrase "a sufficient degree of economic security to make the profession of teaching attractive to men and women of ability" is a part of the "Case for Academic Tenure." It is [*6]mere prefatory language succinctly explaining why tenure is desirable. Importantly, the "Case for Academic Tenure" does not lay out how to obtain tenure. Rather, the tenure process is detailed elsewhere, and, critically, there is no meaningful discussion of compensation at all, except that set forth in the Faculty Handbook's salary grievance section. Thus, contrary to the Professors' contention, "economic security," standing alone, simply does not confer any contractual rights or obligations (see Andersen v Weinroth, 48 AD3d 121, 133 [1st Dept 2007]).
We further find that the absence of any discussion of this term in the Faculty Handbook underscores its vagueness, which is buttressed by the Professors' own differing interpretations of the term throughout this litigation. While the petition alleges that "[t]he tenure guarantee of economic security protects tenured faculty from any diminution in their salaries," in their appellate arguments the Professors take the position that only retroactive, rather than prospective, reductions in salary are prohibited. Thus, as shown by the Professors' own changing interpretations, the term is too vague to be enforceable (see Joseph Martin, Jr., Delicatessen v Schumacher, 52 NY2d 105, 109 [1981]).
Assuming that the term "economic security" gives rise to contractual rights, we reject the argument advanced by the Professors and amici curiae that "economic security" is an ambiguous term of art and that custom and usage in academia define it as prohibiting retroactive salary reductions pursuant to such policies as the REF Policy.[FN6]
Regardless of the kind of transaction involved, New York contract law is well settled and clear: "Ambiguity exists when, looking within the four corners of the document, the terms are reasonably susceptible of more than one interpretation" (Ellington, 24 NY3d at 250). "A contract is unambiguous if 'on its face [it] is reasonably susceptible of only one meaning'" (Macy's Inc. v Martha Stewart Living Omnimedia, Inc., 127 AD3d 48, 54 [1st Dept 2015], quoting Greenfield v Philles Records, Inc., 98 NY2d 562, 570 [2002]).
The language of the "economic security" provision is clear — it does not include salary considerations. We look no further than the faculty grievance procedures which provide that upon receiving an unfavorable decision concerning a salary grievance, the faculty member may appeal the decision only on two enumerated grounds:
"That the procedures used to reach the decision were improper, or that the case received inadequate consideration;
That the decisions violated the academic freedom [FN7] of the person in question, in which case the burden of proof is on that person."
Thus, the only enumerated grounds for salary grievance review are violations of due process and academic freedom. An "[in]sufficient degree of economic security" is not a ground for resolving a salary grievance dispute. A fortiori, the term "economic security" does not involve salary issues.
Even if the term is ambiguous[*7], we reject the argument that prohibiting the retroactive reduction of a faculty member's salary pursuant to the REF Policy safeguards academic freedom and tenure.[FN8] The Professors and amici curiae acknowledged that NYU could impose the REF Policy prospectively when they abandoned their article 78 claims relating to the promulgation and application of the policy. Their acknowledgment reveals the weakness of their argument — that it would create two classes of tenured faculty, those purportedly influenced by extramural funders and those not so influenced. Because the guarantee of academic freedom applies equally to all tenured faculty, such a distinction would be wholly inexplicable.
Turning to the Professors' contract claim based on the disciplinary process, we note that, contrary to NYU's argument, the language of our reinstatement of the breach of contract cause of action in the prior appeal did not exclude that claim. We found that the Professors "sufficiently alleged that the policies contained in . . . [the] Faculty Handbook . . . 'form part of the essential employment understandings between a member of the Faculty and the University,' [and] have the force of contract" (Matter of Monaco v New York Univ., 145 AD3d at 568 [emphasis added]). Those policies, without a doubt, include the disciplinary procedures.
The Professors argue that NYU violated its own disciplinary procedures when it reduced their salaries without affording them due process pursuant to Title IV of the Faculty Handbook ("General Disciplinary Regulations Applicable to Both Tenured and Non-Tenured Faculty Members"). They contend that their salary reductions based on their failure to fulfill the REF Policy's extramural funding obligations amount to discipline regardless of how NYU characterizes the reductions or whether there exists a salary grievance procedure. We disagree.
Pursuant to Title IV, discipline may be imposed when a faculty member engages in conduct unbecoming a member of the faculty, such as any action that interferes with the regular operations of the university or the rights of others, or any other conduct prejudicial to the teaching, research, or welfare of the university. Prior to the imposition of discipline, specified due process requirements must be satisfied, including a hearing before a faculty hearing committee and the right to an appeal. In the event the faculty committee concludes that discipline is warranted, it can impose sanctions including, but not limited to reprimand, censure, removal of privileges, and suspension.
A faculty member's failure to comply with the REF Policy is simply not conduct that is subject to discipline. The Professors' reliance on Yoon v Fordham Univ. Faculty & Admin. Retirement Plan (2004 WL 3019500, 2004 US Dist LEXIS 26070 [SD NY, Dec. 29, 2004, No. 99-CV-110429 (RCC)], affd 173 Fed Appx 936 [2d Cir 2006]), Klinge v Ithaca Coll. (167 Misc 2d 458 [Sup Ct, Tompkins County 1995], mod 235 AD2d 724 [3d Dept[1997]), and Matter of Soriano [*8]v Elia (155 AD3d 1496, 1500 [3d Dept 2017], lv denied 31 NY3d 913 [2018]) in support of their contrary proposition, that "courts have repeatedly held that universities are required to comply with their disciplinary procedures before imposing salary reductions on faculty for failing to meet performance expectations," is misplaced. None of these cases support this proposition. In Yoon, the court decided whether Fordham University had adhered to its internal procedural guidelines when it terminated a professor and suspended his pay after the professor was found to have committed misconduct. NYU does not allege any misconduct on the part of Professors Monaco and Samuels. The Klinge court concluded that Ithaca College did not follow its disciplinary procedures when it demoted a professor for plagiarism. Klinge, therefore, also involved professor misconduct and is inapposite. Soriano addresses the reassignment of a tenured administrator in a public school district and whether it complied with the requirements of the Education Law. No such concerns are raised in the case at bar.
"Discipline" refers "not merely to action that has an adverse impact, but adverse
action that is motivated by a punitive intent" (Soriano, 155 AD3d at 1498-1499). The flaw in the Professors' analysis is that they focus only on the "stick" and ignore the "carrot." As recognized by Supreme Court, the REF Policy is not disciplinary because it provides not only for salary decreases, but also for salary increases. Indeed, the policy states that its purpose is "to define realistic expectations for research faculty productivity . . . Expectations of salary support on extramural funding and teaching obligations provide a standardized approach to evaluate faculty for merit increases, salary adjustments and incentive rewards for those exceeding expectations." Incentivizing conduct is not punitive. Rather, by its own terms, and as is apparent from the record, the REF Policy is intended to help guide the faculty's productivity by motivating them to secure extramural funding.
NYU argues that Professor Samuels did not plead a breach of contract claim based on the "2001 Contract" in the petition and that even if he did, the claim was never reinstated, because our prior decision concerned contract claims based on provisions of the Faculty Handbook. Supreme Court correctly rejected the argument that the petition did not allege a breach of the "2001 Contract." It found that this claim was not a new theory raised for the first time in the Professors' summary judgment motion, because the parties had litigated the merits of this claim extensively throughout the course of this litigation. We agree with Supreme Court and make an additional observation. The breach of the "2001 Contract" cause of action sets forth the following pertinent allegations:
"Respondents are contractually obligated to abide by the terms of Petitioners' employment contracts which consist of the Handbook, appointment letters, promotion [*9]letters and numerous other communications between Petitioners and Respondents.
"Reduction of Petitioners' salaries pursuant to the Salary Reduction Policy constitutes a material breach of Petitioners' contractual rights, including their guarantees of academic freedom and economic security.
"As a result of the breach of their contractual rights, Petitioners will suffer damages and injuries including, but not limited to, loss of salary and benefits, loss or damage to their professional reputations, and significant disruption to their research."
(emphasis added). There can be no dispute that the "2001 Contract" was an "appointment letter." Thus, these allegations were sufficiently specific to place NYU on notice that Professor Samuels's "2001 Contract" was implicated in the breach of contract cause of action.
Although NYU accurately points out that our reinstatement of the breach of contract claim addressed the Faculty Handbook, we did not limit the claim solely to the handbook. NYU overlooks our additional finding that apart from the Faculty Handbook the petition "sufficiently alleged that [petitioners] had a mutual understanding with [NYU] that tenured faculty members' salaries may not be involuntarily reduced" (Matter of Monaco, 145 AD3d at 568). This finding necessarily includes Professor Samuels's "2001 Contract."
Professor Samuels argues that the "2001 Contract" precludes NYU from reducing his salary pursuant to the REF Policy below the amount stipulated therein. We agree. The terms of the contract are clear and unambiguous. The fact that it is for an indefinite durational term is of no moment. Under the undisputed rules governing tenured faculty, the term of Professor Samuels's employment is permanent and continuous until he either resigns, retires, dies, or is removed in accordance with the applicable terms of the Faculty Handbook. None of those contingencies have occurred. Although NYU contends that nothing in the "2001 Contract" prohibits it from applying the REF Policy to Professor Samuels's salary, nothing in the contract permits NYU to impose the REF Policy on him either (see Ellington, 24 NY3d at 244 [where contract terms are clear and unambiguous the parties' intent must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole]). The "2001 Contract" unambiguously provides that should Professor Samuels "step down as Chair of Pharmacology but remain on the faculty," his salary would be "equivalent to [his then] current salary ($235,226), excluding $10,000 for [his] role as Director of Endocrinology, adjusted for cost of living increases during the time [that he was] Chairman." The only portion of his "compensation package" that was subject to adjustment was his "benefits." Thus, his continued association with NYU by remaining on the faculty after he stepped down as Chairman due to the elimination of his department requires NYU to comply with the salary [*10]terms set forth in his contract (see Ayers v City of Mount Vernon, 176 AD3d 766, 770 [2d Dept 2019]). We find that NYU breached the terms of the "2001 Contract" when it reduced Professor Samuels's salary pursuant to the REF Policy and that he is entitled to summary judgment on this claim.
Accordingly, the order of the Supreme Court, New York County (Francis A. Kahn, III, J.), entered November 23, 2020, which, insofar as appealed from, granted defendants' motion for summary judgment dismissing the complaint, should be modified, on the law, to deny the motion as to plaintiff Professor Herbert Samuels's breach of contract claim arising out of the "2001 Contract" and to grant plaintiff Professor Samuels's motion for summary judgment on that claim, and otherwise affirmed, without costs.
Order, Supreme Court, New York County (Francis A. Kahn, III, J.), entered November 23, 2020, modified, on the law, to deny the motion as to plaintiff Professor
Herbert Samuels's breach of contract claim arising out of the "2001 Contract" and to grant plaintiff Professor Samuels's motion for summary judgment on that claim, and otherwise affirmed, without costs.
Opinion by Oing, J. All concur.
Gische, J.P., Kern, Friedman, Oing, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 22, 2022



Footnotes

Footnote 1: The association was founded in 1915 to advance the standards, ideals, and welfare of the academic profession in higher education.

Footnote 2: NYU and NYU School of Medicine are referred to herein collectively as NYU.

Footnote 3: The initial appointment letter, drafted by NYU, provides, in pertinent part:
"Your compensation package and future annual increases are subject to approval by the NYU Board of Trustees Compensation Committee in accordance with prevailing SOM [School of Medicine] guidelines. Your salary in future years will be adjusted according to changes in the cost of living and any increase in the scope of your work. If, in the future, you should step down as Chair of Pharmacology but remain on the faculty, your salary will be equivalent to that of a tenured professor in the Department of Pharmacology or as appropriate under the tenure-based salary rules applicable at that time."

Footnote 4: The final appointment letter, drafted by NYU, provides, in relevant part:
"Your compensation package and future annual increases are subject to approval by the NYU Board of Trustees Compensation Committee in accordance with prevailing SOM guidelines. Your salary in future years will be increased according to changes in the cost of living and any increase in the scope of your work. If, in the future, you should step down as Chair of Pharmacology but remain on the faculty, your salary will be equivalent to your current salary ($235,226) excluding $10,000 for your role as Director of Endocrinology, adjusted for cost of living increases during the time you were Chairman. Your benefits will be equivalent to those of a tenured Professor of Pharmacology or tenured Professor of Medicine which are applicable at that time."

Footnote 5: We deem the promissory estoppel claim abandoned because Professors Samuels and Monaco failed to advance any argument supporting it.

Footnote 6: Their analogy to Article III judges' constitutionally guaranteed compensation to support their reasoning that "economic security" precludes salary reductions is misplaced. Unlike the disputed term herein, article III, § 1, of the US Constitution unequivocally states that federal judges' compensation "shall not be diminished during their Continuance in Office." Thus, there can be no dispute that a federal judge's salary cannot be reduced. In stark contrast, the Faculty Handbook does not contain any language prohibiting tenured faculty's salaries from being diminished.

Footnote 7: Academic Freedom is defined as:
"Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties, but outside occupations and research for pecuniary gain, except in the case of sporadic and wholly unrelated engagements, should be based upon an understanding with the administration of the University.
"Teachers are entitled to freedom in the classroom in discussing their subject, but they should not introduce into their teaching controversial matter that has no relation to their subject.
"Teachers are citizens, members of a learned profession, and officers of an educational institution. When they speak or write as citizens, they should be free from institutional censorship or discipline, but this special position in the community imposes special obligations. As men and women of learning and educational officers, they should remember that the public may judge their profession and their institution by their utterances. Hence they at all times should be accurate, should exercise appropriate restraint, should show respect for the opinions of others and for the established policy of their institution, and while properly identifying themselves to outside audiences as associated with the University should clearly indicate that they are not institutional spokespeople unless specifically commissioned to serve in such capacity."

Footnote 8: Academic Tenureis defined, in relevant part:
"The general policy of the University with respect to probation and tenure for full-time assistant professors, associate professors, and professors is given below. After expiration of the stipulated probationary periods, full-time associate professors and professors are considered to have permanent or continuous tenure, and their services are to be terminated only for adequate cause, except in the case of retirement, or under extraordinary circumstances because of financial exigencies, or because of the discontinuance of a considerable part of the University, such as a college, school, or division or a department in a college, school, or division. It is understood that the University has the right to reduce the length of the probationary period in specific cases."