NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13472

HENRY H. WORTIS & others[1] vs. TRUSTEES OF TUFTS COLLEGE.


Middlesex.     November 3, 2023. - March 14, 2024.

Present (Sitting at Lowell):  Budd, C.J., Gaziano, Kafker,
Wendlandt, & Georges, JJ.


Contract, Employment, Performance and breach, Construction of
    contract, Private college, School handbook, Custom, Implied
    covenant of good faith and fair dealing.  Employment,
    Personnel manual.  Evidence, Custom and usage.  Practice,
    Civil, Summary judgment.  Estoppel.  Declaratory Relief.
    Words, "Economic security," "Academic freedom."



Civil action commenced in the Superior Court Department on
December 5, 2019.

The case was heard by Maureen B. Hogan, J., on motions for
summary judgment.

The Supreme Judicial Court granted an application for
direct appellate review.


Kevin T. Peters (Jennifer A. Henricks also present) for the
plaintiffs.
Daryl J. Lapp for the defendant.
The following submitted briefs for amici curiae:

---

[1] Amy S. Yee, Theoharis C. Theoharides, Ana M. Soto,
Emmanuel N. Pothos, Michael H. Malamy, David J. Greenblatt, and
Brent H. Cochran.

Matthew W. Finkin, of New York, for Mark Barenberg & others.

Risa Lieberwitz, of Georgia, Aaron Nisenson, of the District of Columbia, Edward D. Swidriski, III, of Texas, & James A.W. Shaw for American Association of University Professors.

Katherine B. Wellington for Association of American Universities.

KAFKER, J.  At issue in the instant case is whether the salary and full-time status of tenured medical school professors at Tufts University (Tufts)[2] may be substantially reduced, and the laboratory (lab) space they previously occupied shrunk or eliminated, consistent with the promises of economic security and academic freedom provided in their tenure commitments.

In particular, the plaintiffs, tenured faculty at Tufts University School of Medicine (TUSM), challenge compensation and lab space policies issued in 2016, 2017, and 2019 that require them to cover fifty percent of their salary with external research funding.  Under the plans, if the plaintiffs did not maintain the fifty percent funding requirement, their salaries would be cut and their employment status would be reduced from full time to part time.  To maintain their existing lab space, the plaintiffs were also required to ensure that their external research funding maintained a cost recovery rate equivalent to a

---

[2] Tufts University is incorporated in Massachusetts as "Trustees of Tufts College."  For the sake of simplicity, we refer to the defendant as "Tufts" throughout the opinion.

Federal grant from the National Institutes of Health (NIH). When the plaintiffs failed to meet the external funding requirements set out in the policies, they had their salaries cut, their full-time status reduced, in some cases to part time, and their lab space reduced or closed entirely, although they had access to other lab space and any grant applications they submitted would include a commitment by TUSM to provide the appropriate resources to conduct the work.

The plaintiffs then sued Tufts in the Superior Court, arguing that the compensation and lab space policies violated their rights to academic freedom and economic security guaranteed by their tenure contracts. The court granted summary judgment in Tufts's favor on all counts, ruling that the compensation and lab space policies did not violate the plaintiffs' tenure rights, and the plaintiffs appealed.

We conclude that academic freedom and economic security are not hortatory concepts but important norms in the academic community. Importantly, they are substantive terms expressly incorporated in Tufts's tenure documents. The meaning of at least economic security is not, however, self-explanatory and may vary depending upon the particular university and even the particular school within the university. We further conclude that the meaning of economic security for tenured medical school professors at Tufts is ambiguous in the tenure documents, and

more evidence is required regarding the customs and practices and reasonable expectations related to salary and full-time status for tenured professors at TUSM, and even other universities and medical schools, to resolve the question whether the significant reductions in salary and full-time status imposed here violated the economic security provided in the tenure documents. Summary judgment was therefore not appropriate on this issue. In contrast, nothing in the tenure documents, including the protection provided by the terms "academic freedom" and "economic security," guarantee the lab space commitments claimed here. Summary judgment on these claims was therefore proper. We therefore affirm in part and reverse in part.[3]

1. Background. a. Facts. The following facts are drawn from the order on the parties' cross motions for summary judgment, supplemented by other uncontroverted facts in the summary judgment record, and are either not in dispute or viewed in the light most favorable to the plaintiffs, against whom summary judgment entered. Williams v. Board of Appeals of Norwell, 490 Mass. 684, 685 (2022).

---

[3] We acknowledge the amicus briefs submitted by the Association of American Universities, the American Association of University Professors, and a group of law professors.

TUSM, one of Tufts's schools, divides its faculty into basic science faculty and clinical faculty. Basic science faculty at TUSM are, according to the faculty handbook, "to participate in the teaching of programs of the professional schools, to direct graduate-training programs, to serve as a source of expertise within the Tufts community, and to conduct original research." Clinical faculty members are generally not involved in classroom teaching but rather are primarily responsible for providing services to patients at affiliated hospitals or other clinical settings and for providing practical training of medical students. The plaintiffs are all tenured basic science faculty at TUSM and were all granted tenure at different times, dating as far back as 1970 and as recently as 2009.

i. The plaintiffs' tenure contracts. A. Appointment and promotion letters. To understand the scope of the plaintiffs' tenure protections, we look first to the letters each plaintiff received granting them tenure. Each plaintiff was granted tenure at some point between 1970 to 2009, before the lab space and salary policies went into effect in 2016 and 2017. The letters themselves say little to nothing about the terms or scope of the plaintiffs' tenure and say nothing about salary and lab space reductions or reductions in full-time equivalent (FTE) status. A few of the plaintiffs received specific salary and

lab space commitments in their initial offer letters, but their subsequent tenure letters do not discuss the effect of tenure on those prior commitments.

Plaintiff Dr. Michael H. Malamy received tenure when he was appointed an associate professor of molecular biology and microbiology at TUSM, "without limit of time," in 1970. The letter granting him tenure indicates that Tufts appointed him "subject to the provisions of the applicable bylaws and University policies" but otherwise says nothing about the terms of his tenure. Plaintiff Dr. Henry H. Wortis was granted tenure in 1976 in a letter that also stated his appointment was "without limit of time" and "subject to the provisions of the applicable bylaws and University policy."

In 1991, plaintiff Dr. Theoharis C. Theoharides was granted tenure. The 1991 letter is not in the record. Plaintiff Dr. David J. Greenblatt was granted tenure in 1992. As with the other plaintiffs, Greenblatt's letter is silent on the terms of tenure or the questions of salary reductions and lab space. The letter provided in the record discusses the recommendation of the Basic Sciences Appointments, Promotions and Tenure Committee (tenure committee) to grant Greenblatt's tenure and notes favorably his reputation "as an expert in the area of pharmokinetics" and his citation as one of "the world's twenty most prolific researchers." A year later, in 1993, plaintiff

Dr. Brent H. Cochran was granted tenure based on the recommendation of the tenure committee. Again, the letter does not offer details about the tenure arrangement but does note that the tenure recommendation was based on Cochran's "past research accomplishments, [his] demonstrated commitment to teaching and to the training of students and postdoctoral fellows," as well as his "consistent record of grant support from NIH." Cochran's initial offer letter notes that his starting salary would be "$70,000 with half being provided by Tufts, including fringe benefits." The offer letter also notes Tufts's agreement to provide lab and office space, plus lab start-up funds and, if needed, up to $100,000 for one year or until Cochran received grant support to replace the funding he had been receiving from his previous employer.

In 1994, plaintiff Dr. Ana M. Soto was granted tenure. As with the other letters, Soto's letter does not discuss the terms of her tenure but notes that tenure was "awarded based on [her] scientific accomplishments," "contributions to teaching," "service to the university," and "national and international reputation as a reproductive toxicologist."

In 1998, plaintiff Dr. Amy S. Yee was granted tenure by Tufts's board of trustees. Her letter also does not discuss what protections or benefits tenure provides. The letter notes that tenure was granted based on her "ability to publish

innovative studies and to obtain research funding in a highly competitive area," her "high recognition as a contributor to the field of developmental transcription factors, as evidenced by invitations to present [her] work at highly selective scientific meetings and at major institutions," her commitment to teaching, and her service on key university committees. Her 1989 letter offering her a "tenure-track" appointment to assistant professor included an initial twelve months' salary offer and a specified amount of lab space and start-up funds for her lab.

Finally, and most recently, Dr. Emmanuel N. Pothos was granted tenure in 2009. Like the previous letters, his letter does not lay out the terms of tenure but notes that the recommendation was made by the tenure committee based on his "demonstrated excellence in research, teaching and service to the university." Pothos's appointment letter for his initial tenure-track assistant professor position at Tufts provides more detail than most of the other appointment letters. First, it notes that his salary would initially be wholly paid by TUSM in the first year of his appointment, and then reduced to sixty percent in the second year, and by the third year, he would be expected to cover at least fifty percent of his salary with outside grant funding. Second, it specifically offered him "appropriate laboratory and office space" as well as funds to defray the cost of lab equipment, supplies, and personnel.

B. <u>Faculty handbook</u>.  In addition to the tenure letters, we also consider other documents to define the scope of tenure. The parties agree that the TUSM faculty handbook (faculty handbook) is a part of the tenure contract.  The parties further agree that certain policies, including the basic science faculty appointment, promotion, and separation policy (basic science policy) and the policy on academic freedom, tenure, and retirement (AFTR policy) (both described in detail <u>infra</u>), set forth in the faculty handbook, are part of the plaintiffs' tenure agreements with Tufts.[4]  Nonetheless, nothing from the faculty handbook in the record, including the basic science policy and the AFTR policy, specifically addresses reductions in salary, FTE status, or lab space.

C. <u>Basic science policy</u>.  The basic science policy included in the record lays out the requirements for appointment

---

[4] We note that the record does not include a full copy of the current faculty handbook.  The record also indicates that there have been amendments and revisions to the faculty handbook, but it is unclear how or when such amendments or revisions happened or the substance of any such amendments or revisions.  The record also does not include the faculty handbooks or the basic science and AFTR policies in place at the time each faculty member was awarded tenure.  Nonetheless, as both parties agree that the commitments to academic freedom and economic security reflected in the current AFTR policy and faculty handbook apply to all of the plaintiffs in this case, and disagree only as to their legal significance, we therefore assume, for the purposes of summary judgment, that the relevant language, or at least the concepts of academic freedom and economic security so described, is applicable and that we must determine their legal significance.

and promotion to tenured positions within TUSM in detail. However, apart from noting that "[t]enure reflects a long-term commitment by the University to the academic freedom and security of faculty members," the basic science policy does not explain what protections tenure provides.  Nor does the basic science policy discuss salary or FTE reductions.  It does state, however, that "[d]etails on the tenure policy can be found in the document Policy on Academic Freedom, Tenure, and Retirement of the Board of Trustees of Tufts University."

 The section on separation from TUSM provides the procedures for termination for cause of faculty with permanent or continuous tenure, but it does not address salary beyond noting that a tenured faculty member terminated for reasons other than moral turpitude will receive his or her salary for one year. The basic science policy is similarly silent on whether faculty members are guaranteed lab space or whether lab space may be reduced.  Most of the basic science policy focuses on the substantive prerequisites for receiving tenure.  The introduction to the basic science policy included in the record does, however, state that "[t]he personnel policies and practices for all faculty appointments derive from a variety of sources, including the Bylaws of the Faculty, policies adopted by the Trustees of the University, and policies adopted by the University and/or the School of Medicine."

D. <u>AFTR policy</u>.  The AFTR policy consists of six sections: (I) introduction to academic freedom and tenure; (II) academic freedom; (III) academic tenure; (IV) nonreappointments not involving tenure; (V) academic year; and (VI) emeritus status. Section I incorporates verbatim the language of the American Association of University Professors's (AAUP's) 1940 Statement of Principles on Academic Freedom and Tenure (1940 statement). It begins by emphasizing that "[a]cademic freedom is essential to the free search for truth and its free exposition and applies to both teaching and research."  The next paragraph states in whole:

> "Tenure is a means to a certain ends, especially:  (1) Freedom of teaching and research and of extramural activities, and (2) A sufficient degree of economic security to make the profession attractive to men and women of ability."

Economic security is not further defined in the AFTR policy, but academic freedom is defined in § II to include:  "full freedom in research and in the publication of the results, subject to adequate performance of [the teacher's] other academic duties;" (b) freedom in the classroom in discussing the teacher's subject, so long as the teacher refrains from introducing controversial matter not related to the subject being taught; and (c) freedom from "institutional censorship or discipline" when the teacher "speaks or writes as a citizen."  This

definition of academic freedom is essentially the same as the definition in the 1940 statement, discussed in detail _infra_.

Section III of the AFTR policy describes the procedural requirements for obtaining tenure and the procedural protections to which a faculty member is entitled in the case of termination for cause. To obtain tenure, a faculty member must have completed a probationary period of seven years of full-time service. At the end of the probationary period, a full-time faculty member who meets certain eligibility requirements will "be granted an appointment with permanent or continuous tenure, unless he/she is notified in writing to the contrary prior to the beginning of the last year of the probationary period." After tenure is granted, Tufts faculty "will be terminated only for adequate cause, or under extraordinary circumstances because of bona fide financial exigencies or program discontinuance or resignation or retirement." Like the 1940 statement, the AFTR policy entitles tenured faculty to a hearing upon request in the case of dismissal for cause. The AFTR policy is also silent on salary and FTE reductions or reductions in lab space.[5]

---

[5] While both parties rely heavily on both the AFTR and basic science policies to make their case, based on the record before us we do not know whether either policy was in place at the time the plaintiffs were granted tenure. The AFTR policy indicates that it was revised in 2014, but we do not know when it was first adopted. Similarly, the basic science policy states that it was approved and adopted in April 1999, but portions of the

E.  The 1940 statement.  The central language at issue in the AFTR policy is taken verbatim from the AAUP's 1940 statement.  The 1940 statement was the product of compromise between professors and university administrators.  M.W. Finkin & R.C. Post, For the Common Good:  Principles of American Academic Freedom 47-48 (2009).  The AAUP sought out a partner in drafting the 1940 statement and ultimately found such a partner in the Association of American Colleges, an organization representing the administrators of undergraduate colleges and universities.  Metzger, The 1940 Statement of Principles on Academic Freedom and Tenure, 53 Law & Contemp. Probs. 3, 12, 23-24 (1990).

The 1940 statement seeks, in its own words, to "promote public understanding and support of academic freedom and tenure and agreement upon procedures to ensure them in colleges and universities."  Universities exist to serve "the common good and not to further the interest of either the individual teacher or the institution as a whole.  The common good depends upon the free search for truth and its free exposition."  Thus, academic freedom is essential to the common good because "[f]reedom in research is fundamental to the advancement of truth" and freedom

---

document indicate that certain provisions were adopted and revised well before 1999.  For example, the documentation of criteria guidelines, referenced in the policy, were adopted in 1983.

in teaching protects both the professors' right to teach and the students' freedom to learn.  Academic freedom "carries with it duties correlative with rights."  This is the context in which the AAUP introduces the concept of tenure.  The third paragraph following these introductory statements declares that

> "[t]enure is a means to certain ends; specifically (1) freedom of teaching and research and of extramural activities, and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability.  Freedom and economic security, hence, tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society."

The 1940 statement then lays out the three components of academic freedom:  (1) full freedom in research and in the publication of results, subject to adequate performance of other academic duties; (2) freedom in the classroom; and (3) the ability to speak or write as citizens, free from institutional censorship or discipline.

Finally, the 1940 statement concludes with a section that states:  "the precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated."  It also describes tenure as "permanent and continuous" and that once tenure has been granted, faculty "should be terminated only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies."  Moreover, termination for cause "should, if

possible, be considered by both a faculty committee" and the university's governing board, with the opportunity for a hearing in cases where facts are in dispute.  Tufts's AFTR policy provides substantively the same termination policies.

ii. <u>Research, funding, and lab space</u>.  As reflected in the parties' statement of undisputed facts, "[s]cientific research at TUSM, like other medical schools, is expensive and funded in significant part by grants from external sources, which include federal agencies including the [NIH]; state agencies; pharmaceutical and other biomedical companies; and private donors including family foundations and individuals."  The process to secure Federal funding for biomedical research is also highly competitive.  At TUSM, like other medical schools, external funds are used to underwrite both the "direct" and "indirect" costs of the research effort, including some of the salary for the faculty members serving as principal investigators and others who work on the projects, as well as the lab space, equipment, and materials used in the research. This is, at least in part, because Tufts owns all of the lab space and all of the research equipment and materials obtained through grants, and bears the significant administrative and facilities costs associated with basic science research.

It is also undisputed that the award of tenure does not imply a guarantee of specific lab space to a specific

individual.  That being said, if a faculty member's lab space is reduced, or closed entirely, the faculty member still may submit grants, and TUSM will provide access to alternative space and equipment as needed to support the faculty member's actual research needs.  All grant submissions by TUSM faculty include a commitment by TUSM that it will provide the appropriate resources to conduct the work.  Researchers who lack individually assigned space may also share space with colleagues, as some of the plaintiffs have done.  Finally, the vast majority of medical schools in the United States condition salary for basic science faculty, at least in part, on performance metrics, which include success in generating external research funding.

iii.  2009 salary plan.  In July 2009, Tufts adopted the Faculty Salary Modification Plan (2009 salary plan), which required full-time tenured basic sciences faculty to generate enough external funding to cover a significant portion of their base salary.  Specifically, Tufts measured the "[three]-year rolling average" of the fraction of their salary covered by external grants.  If that three-year average fell to fifteen percent or less, faculty members were subject to a review process in which they were evaluated on factors such as the number and quality of publications, the dollar amounts of extramural support, sources of extramural support, and ongoing

efforts to obtain additional extramural funds. Depending on the outcome of the review, faculty could have their salary reduced to either seventy-five percent of their current salary or the base salary for their relevant rank (i.e., associate or full professor).

Prior to 2009, tenured medical school professors who did not generate external funding to cover a significant percentage of their base salary were not required by any formal policy to have their salaries reduced. Three of the plaintiffs, Pothos, Yee, and Malamy, were notified of or experienced salary reductions under the 2009 salary plan but did not challenge those salary reductions in court as a violation of their tenure rights.[6]

iv. <u>Lab space guidelines</u>. In 2016, TUSM adopted the Tufts University School of Medicine Research Space Guidelines (lab space guidelines), which linked continued faculty access to lab space to maintaining a certain level of external research funding. Specifically, faculty were expected to maintain an indirect cost recovery[7] rate equivalent to the rate provided by

---

[6] Yee and Malamy sought review of their salary cuts from a committee established under the 2009 salary plan, however neither challenged the legal authority of Tufts to impose the cuts.

[7] "Indirect cost recovery" refers to reimbursement for costs that Tufts has already paid as part of conducting research, such

an NIH grant.  If faculty fell below this rate, they were at risk of lab space reductions or even closure of their lab space.

v.  2017 and 2019 compensation plans.  In 2017, Tufts implemented the TUSM Compensation Plan for Tenured Basic Science Faculty (2017 compensation plan), which required that tenured faculty "obtain support for at least [fifty percent] of their salary through extramural funding, direct cost support, facility and administrative cost support and/or other sources to support an active laboratory."  Faculty who failed to cover the required fifty percent of their salary with external research funds could face reductions in their institutional base salary[8] of up to ten percent per year and reductions in their FTE status by up to 0.25 FTE annually, although such reductions could never go below a floor of 0.50 FTE.

Several of the plaintiffs and other faculty (grievants) initiated a grievance challenging the 2017 compensation plan and the lab space guidelines.  The TUSM Faculty Grievance Committee Hearing Board (faculty hearing board) held a hearing over five

---

as investment in laboratories, information technology, hazardous waste disposal, and compliance with various State and local regulations.  Direct costs are expenses such as salaries, equipment, and allocated lab space.

[8] Institutional base salary refers to the salary Tufts pays faculty before bonuses and other additional income is added.  It is set in reference to differing percentiles of the average salary paid to medical school faculty in the northeastern United States.

days in May and June 2018 and issued its findings and recommendations to Tufts's president, Anthony Monaco, in August 2018.

The faculty hearing board issued a detailed sixteen-page decision. The decision began with fact finding related to the $6 million operating deficit of TUSM and concerns expressed by the school's accrediting body regarding that deficit. The faculty hearing board also found that "[a]n important component of TUSM's deficit is the significant subsidy needed to support basic science research largely resulting from a decrease in sponsored research funding. In [fiscal year 2017], TUSM Administration note[d] that $20 million was needed to support its basic science research infrastructure." The faculty hearing board further found that "TUSM's ability to manage and efficiently utilize research space is crucial to its fiscal recovery." The faculty hearing board then concluded regarding lab space: "The Research Space Guidelines do not violate Grievants' rights as tenured faculty members, including their rights under the AFTR Policy and the Handbook Policy" as neither academic freedom nor economic security "guarantee Grievants a right to a certain amount of TUSM-funded research space -- or to any research space at all."

The faculty hearing board concluded otherwise regarding compensation reductions:

> "While TUSM may institute a compensation plan that conditions maintenance of certain salary levels and full-time employment upon faculty satisfaction of extramural funding requirements and other factors without violating Grievants' rights as tenured faculty members, the Compensation Plan as currently written and operationalized is vague, confusing and can result in the setting of a compensation level which violates Grievants' rights under the AFTR Policy."

The faculty hearing board further concluded:

> "The evidence at the formal hearing established that a majority of Grievants were performing well with respect to their teaching and service commitments to TUSM and a number in that group also have been working hard to increase their extramural funding even though their efforts have not been rewarded with grant success.  Where tenured faculty demonstrate proficiency in teaching and service and where their efforts to obtain extramural funding are satisfactory even though their results are not, the [faculty hearing board] finds that it would be a violation of their tenure rights for TUSM to reduce their institutional base salary level below the [American Association of Medical Colleges (AAMC)] [twenty-fifth] percentile[9] for a 1.0 FTE."

It did, however, "accept the notion that there could be a basis for an FTE reduction to a tenured faculty member, so long as it does not go lower than 0.75."

The faculty hearing board's decision was appealed to Monaco.  He likewise concluded that the lab space guidelines did not violate the grievants' tenure rights.  According to Monaco, the lab space reductions

> "do not violate the AFTR or the Basic Science policies in that they:  (1) are within TUSM's authority to implement;

---

[9] The AAMC twenty-fifth percentile refers to the twenty-fifth percentile of salaries recorded in an AAMC survey of faculty salaries at private medical schools in the northeastern United States.

(2) do not compromise academic freedom; (3) provide lab space commensurate with need as extramural research funding ebbs and flows; and (4) do not violate the principles of economic security in the AFTR Policy because the Grievants are not entitled to a particular amount of space, or any space at all."

Monaco also found that

"just as the AFTR Policy does not provide any entitlement to laboratory space, it also does not provide any entitlement to a specific salary. While tenure should afford a sufficient degree of economic security to men and women of ability, it does not guarantee Grievants a salary at the AAMC [twenty-fifth] percentile. If TUSM were to adopt the [faculty hearing board's] view, all full professors would be entitled -- regardless of performance factors and contributions to the tripartite mission of the School -- to an annual salary in [fiscal year 2019] of $164,250."

Monaco directed TUSM to revise the 2017 compensation plan to, among other things, (1) clarify that an FTE reduction would come with a corresponding reduction of work commitment and that "[a] faculty member's tenure would not automatically be at risk in these situations," (2) clarify the weight placed on peer reviewed extramural funding in evaluating performance, and (3) make clear that mere efforts to obtain grants were not sufficient under the 2017 compensation plan and that faculty were "expected to actually compete for and obtain peer reviewed extramural research support."

TUSM revised the 2017 compensation plan in response to Monaco's directive and implemented a revised version in July 2019 (2019 compensation plan). The 2019 compensation plan

largely preserved the terms of the 2017 compensation plan, including the potential reduction in FTE status to fifty percent, but it clarified that all sources of peer-reviewed, extramural funding would be considered in evaluating faculty performance and that any FTE reduction would come with a corresponding reduction in work effort required of the faculty member. Further, if a faculty member's FTE remained below 0.75 for four consecutive years and the faculty member failed to meet other expectations of their employment with Tufts, the faculty member could be subject to review under Tufts's tenure revocation procedures.

All of the plaintiffs' base salaries were reduced under the 2017 and 2019 compensation plans as a result of their inability to obtain sufficient external research funding. Wortis's salary was reduced from $190,176 in 2017 to $97,047 and his appointment reduced to 0.50 FTE. Yee's salary was reduced from $139,387 to $77,220 and her appointment reduced to 0.60 FTE. Theoharides's salary was reduced from $210,728 to $115,216 and his appointment reduced to 0.75 FTE. Soto's salary was reduced from $214,569 to $149,943 and her appointment reduced to 0.85 FTE. Pothos's salary was reduced from $114,000 to $71,165 and his appointment cut to 0.65 FTE. Malamy's salary was reduced from $152,324 to $147,800, although his appointment was not reduced. Greenblatt's salary was reduced from $201,499 to $159,200, but

his appointment was not reduced. Cochran's base salary was not reduced during the period at issue, but his appointment was reduced to 0.90 FTE. Pursuant to the lab space guidelines, four of the plaintiffs have experienced or were informed that they will experience a reduction or closure of their assigned lab space. Tufts has, however, made lab space available for all faculty who are submitting grants, including the plaintiffs.

b. Procedural history. The plaintiffs commenced suit against Tufts in the Superior Court in December 2019, claiming breach of contract (count I), breach of the implied covenant of good faith and fair dealing (count II), declaratory judgment (count III), equitable estoppel (count IV), and violations of the Wage Act, G. L. c. 149, § 148 (count V). The parties filed cross motions for summary judgment, and in February 2023, the court granted summary judgment to Tufts on all counts and issued a declaratory judgment that the compensation plans and lab space guidelines did not violate academic freedom or economic security. The plaintiffs appealed, and we granted their request for direct appellate review.

2. Discussion. We review the grant of summary judgment in Tufts's favor de novo to "determine whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law." Galenski v. Erving,

471 Mass. 305, 307 (2015).  When both parties have moved for summary judgment, as they did here, we view the evidence in the light most favorable to the party against whom judgment was entered.  Twomey v. Middleborough, 468 Mass. 260, 267 (2014).

Tenure, and the benefits it confers, is defined by the contract between a university and a tenured professor.  See Krotkoff v. Goucher College, 585 F.2d 675, 680 (4th Cir. 1978).[10] As we do in all contracts, we strive "whenever reasonably practical" to give every word meaning when interpreting a contract (citation omitted).  DeWolfe v. Hingham Ctr., Ltd., 464 Mass. 795, 806 (2013).  "In interpreting a university contract, we are also guided by two fundamental principles . . . .  First, we employ 'the standard of reasonable expectation -- what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.[11]  Second,

_____

[10] That contract may vary from university to university and between different schools within a university.  See Krotkoff, 585 F.2d at 680 ("Parties to a contract may, of course define tenure differently in their agreement"); White, Academic Tenure: Its Historical and Legal Meanings in the United States and its Relationship to the Compensation of Medical School Faculty Members, 44 St. Louis U. L.J 51, 66 (2000) ("Individual institutions are free to depart from traditional notions of academic tenure . . .").

[11] We note that "the rules governing tenure -- and of academic freedom intimately connected to it -- are not bargained with the applicant or incumbent at all.  These are policies adopted by the institution, customarily in consultation with a faculty governing body, not discrete bargained-for individual

we 'adhere to the principle that courts are chary about interfering with academic decisions made by private colleges and universities.'" (Quotations, citations and alterations omitted.) Berkowitz v. President & Fellows of Harvard College, 58 Mass. App. Ct. 262, 269 (2003), quoting Schaer v. Brandeis Univ., 432 Mass. 474, 478, 482 (2000).  In evaluating the standard of reasonable expectation, we also recognize that "[c]ontracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them.  This is especially true of contracts in and among a community of scholars, which is what a university is."  Browzin v. Catholic Univ. of Am., 527 F.2d 843, 848 (D.C. Cir. 1975), quoting Greene v. Howard Univ., 412 F.2d 1128, 1135 (D.C. Cir. 1969).

As in any contract, "[w]hen the words of a contract are clear, they must be construed in their usual and ordinary sense.  Contract language is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one."  (Quotation and citations omitted.)  Brigade Leveraged Capital Structures Fund Ltd. v. PIMCO Income Strategy Fund, 466 Mass. 368, 374 (2013).  Where a contract's terms are ambiguous, extrinsic evidence may be admitted.  Id.  This may include evidence of

exchanges."  Finkin, Tenure in New York, 70 Buff. L. Rev. 1891, 1900 (2022).

past practices, custom, and trade usage. See <u>Affiliated FM Ins. Co</u>. v. <u>Constitutional Reinsurance Corp</u>., 416 Mass. 839, 845-846 (1994). See also <u>Somerset Sav. Bank</u> v. <u>Chicago Title Ins. Co</u>., 420 Mass. 422, 428 (1995) ("pertinent custom and usage are, by implication, incorporated into a [contract] and are permissible to aid in [contract] interpretation, not as tending to contradict or vary a contract, but on the theory that usage forms part of the contract"). With these contract principles in mind, we turn to the tenure contracts at issue.

a. <u>The employment contracts</u>. The first question we confront is what documents make up each plaintiff's contract with Tufts. As other courts have concluded, tenure contracts are rarely distilled in a single document, and this case is no exception. See <u>McAdams</u> v. <u>Marquette Univ</u>., 2018 WI 88, ¶ 4 (finding that tenure contract was comprised of appointment letter and faculty statutes, faculty handbook, and other documents expressly incorporated by appointment letter). Often, the contract comprises a collection of documents, such as an offer letter, a faculty handbook, and other rules or policies of the college. See <u>id</u>. See also <u>Greene</u>, 412 F.2d at 1135 ("The employment contracts of appellants here comprehend as essential parts of themselves the hiring policies and practices of the University as embodied in its employment regulations and customs"). In this case, the tenure letters, faculty handbook,

basic science policy and AFTR policy form the basis of the tenure contract.

The next question is what those contract documents say, directly or indirectly, about the reduction in salary, FTE status, and lab space of tenured professors. As explained above, the tenure appointment letters say little about the terms of the plaintiffs' tenure, apart from stating that they have been offered tenure-track positions or granted tenure, and say nothing about salary or FTE status reduction and lab space reassignment or reduction. The issues are also not specifically or directly addressed in the faculty handbook, or at least the excerpts of the faculty handbook included in the record.

The two most pertinent documents are the basic science policy and the AFTR policy. Although they do not directly address the issues, they do contain relevant language that requires consideration. Before this court, Tufts stresses the importance of the introductory language in the basic science policy that "[t]he personnel policies and practices for all faculty appointments derive from a variety of sources, including the Bylaws of the Faculty, policies adopted by the Trustees of the University, and policies adopted by the University and/or

the School of Medicine."[12]  Tufts then contends that this language therefore provides for the application and incorporation of the lab space guidelines and compensation plans into the tenure contracts.  Whether this language incorporates future policies, or at least future policies undermining express contractual rights and expectations, such as economic security, is far from clear.  Cf. O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 694 (1996) (declining to "define the extent to which management may effectively reserve its right to change or withdraw a [personnel] manual," where manual contained no reservation of rights or disclaimer of obligations); Saxe v. Board of Trustees of Metro. State College of Denver, 179 P.3d 67, 75 (Colo. Ct. App. 2007) ("We need not resolve whether an employer may reserve the right to change any provision within an employment handbook without notice or consideration because even courts endorsing unilateral modification of an employment handbook have held that an employer may not abrogate an employee's vested benefits"); Drans v. Providence College, 119 R.I. 845, 857 (1978) (rejecting interpretation that all of university's rules, regulations, and so forth may be impliedly

---

[12] Two of the plaintiffs' (Malamy's and Wortis's) tenure letters contained a similar statement that their appointments were "subject to the provisions of the applicable bylaws and University policies."

incorporated into faculty employment contracts).  At best this language is ambiguous.

Tufts also relies on the criteria for granting tenure, which requires significant scholarship, including that a "successful candidate should show a sustained level of substantial contributions, and have the potential for long-range, continuous productivity in an area of biological importance."  Nothing in the policy, however, states that once tenure is granted, the same standards apply to retaining tenured status and the rights and benefits it entails.

In sum, although there is some relevant language in the basic science policy, it is at best ambiguous in regard to the questions we must decide regarding the reduction in salaries, FTE status, and lab space.

We turn next to the AFTR policy.  The plaintiffs, in contrast to Tufts, rely heavily on the AFTR policy.  That policy, however, does not specifically address reductions in salary, FTE status, or lab space.  While the AFTR policy provides strict procedures governing when and how a faculty member with tenure may be terminated, it does not clarify whether these same or different protections extend to salary or lab space reductions.  The plaintiffs rely for the most part on the economic security, academic freedom, and "permanent or

continuous" tenure protections provided for tenured faculty, which we analyze in detail infra.

b. Economic security as applied to salary reductions and FTE status. i. Whether economic security is a prefatory term. As a threshold matter, we conclude that economic security is an important substantive provision of the tenure contract and not a prefatory or hortatory term.

First and foremost, the term "economic security" is expressly included in the tenure documents. Thus, reading it as prefatory or hortatory ignores the cardinal rule of contract interpretation that whenever "reasonably practicable," we strive to give effect to every word in a contract. Hagerty v. Myers, 333 Mass. 387, 388-389 (1955) (rejecting interpretation of contract that required giving "no weight whatsoever" to several phrases and "treating their use as utterly pointless"). Indeed, economic security is central to the tenure contract's definition of tenure as set forth in the AFTR policy. Tenure is described as a means to an ends, with the ends being specifically defined as economic security and academic freedom.

Other provisions in the AFTR policy further support the substantive purpose and meaning of economic security. The AFTR policy also states that tenure is "permanent or continuous" once granted. Permanent or continuous tenure would seem to be a hollow promise if it came without any salary commitment or

strong protections against outright termination.  A tenured professor, according to the tenure documents, cannot be terminated without cause or financial exigency.  If their salaries could be reduced at will, this contractual protection would be of very limited value.  Cf. American Ass'n of Univ. Professors v. Bloomfield College, 129 N.J. Super. 249, 266 (Ch. Div. 1974), aff'd, 136 N.J. Super. 442 (App. Div. 1975) ("The interests involved, after all, are fundamentally incompatible. Each encroaches upon the other.  The expansion of one implies a constriction of the other").

Reading economic security as hortatory also ignores the admonishment to read any ambiguities in the terms of tenure contracts "by reference to the norms of conduct and expectations founded upon them," which in this case are the norms and expectations of the academic community.  Browzin, 527 F.2d at 848.  The language at issue comes verbatim from the 1940 statement, which courts have looked to, alongside other evidence of custom and norms in the academic community, as an appropriate guide for interpreting tenure contracts.  See id. at 847 n.8 (finding AAUP's statements on tenure and academic freedom appropriate guides in interpreting tenure contracts because they "represent widely shared norms within the academic community"). See also Jimenez v. Almodovar, 650 F.2d 363, 368 (1st Cir. 1981) (citing 1940 statement and other AAUP statements to fill in

implied terms in professor's employment contract); Krotkoff, 585 F.2d at 678 (looking to 1940 statement, case law, and general purpose of tenure to find implied financial exigency exception in tenure contract).

To read economic security as merely hortatory would be to undermine an essential attribute of tenure, and why it is treasured in the academic world.  There is a reason champagne corks pop when tenure is awarded, and economic security is one of those obvious reasons.  Cf. Saxe, 179 P.3d at 76 (after reviewing evidence of "practices, customs, usages, and norms of tenure," court concluded that "[i]f tenured faculty would lose their priority or right to relocation in the event of layoff decisions, they would effectively be relegated to the status of nontenured faculty. . . .  These rights lie at the heart of the concept of tenure because tenure provides job security and thereby encourages academic freedom").

In concluding that the term is merely hortatory, the Superior Court relied on a New York Supreme Court, Appellate Division, decision, Monaco v. New York Univ., 204 A.D.3d 51 (N.Y. 2022), which we do not find persuasive.  See generally Finkin, Tenure in New York, 70 Buff. L. Rev. 1891 (2022) (providing detailed critique of Monaco).  Monaco is also distinguishable as the court relied on the fact that the reference to economic security appeared in a separate section of

the New York University faculty handbook, titled "Case for Academic Tenure," which did not discuss how to obtain tenure and did not meaningfully discuss compensation.  Monaco, supra at 60. The tenure process was set out in a separate section.  Id. Here, the term economic security is introduced in § I of the AFTR policy, which does not merely discuss why tenure is important but defines its meaning.

ii.  Ambiguity of the term "economic security" and past practices at Tufts.  While the term "economic security" is not prefatory or hortatory, we do conclude that it is ambiguous, as it is "susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one" (citation omitted).  Brigade Leveraged Capital Structures Fund Ltd., 466 Mass. at 374.  Most importantly, the AFTR policy does not define economic security beyond the requirement that it be sufficient to attract "men and women of ability."  These words alone, we conclude, are not clear enough to provide guidance on what types of salary reductions, if any, are permissible for tenured professors.

The other undisputed facts in the record also do not resolve this ambiguity or answer this question.  Until 2009, no policies were in place allowing for the reduction of salaries of tenured professors due to their failure to meet expectations regarding outside funding, thereby suggesting, in the light most

favorable to the plaintiffs, that tenured professors would not reasonably understand that their salaries could be reduced for this reason. We also have no evidence in the record establishing whether the salaries of tenured professors had been reduced for this reason prior to 2009.

Conversely, in 2009, when some of the plaintiffs' salaries were reduced, the plaintiffs did not challenge this reduction in court as a violation of their tenure rights, thereby suggesting the opposite, at least in regard to a reduction of up to twenty-five percent. When the policy changed in 2017, allowing greater reductions, the plaintiffs did challenge the 2017 compensation policy and the faculty hearing committee agreed that the 2017 compensation policy violated the economic security provisions, although it also found that a reduction in FTE status to seventy-five percent was permissible. All of this suggests that economic security is a substantive requirement but that further evidence regarding the correct application of the economic security provision, including the practices and customs at TUSM and other similarly situated institutions regarding reductions in salary and FTE status of tenured professors, is required to define what types of reductions are consistent with, and not in violation of, the economic security protected by the tenure contract at issue.

In sum, based on the record before us, there is a genuine issue of material fact whether the significant reductions in salary and full-time status at issue here violate the reasonable expectations of tenured medical school professors associated with economic security and other provisions in their tenure contracts.

We also cannot answer the question regarding reductions in salary and FTE status and economic security based on the case law. There is very limited case law and commentary on the meaning of economic security in this context. See White, Academic Tenure: Its Historical and Legal Meaning in the United States and its Relationship to the Compensation of Medical School Faculty Members, 44 St. Louis U. L.J. 51, 73 & n.90 (2000). In Kirschenbaum v. Northwestern Univ., 312 Ill. App. 3d 1017, 1019 (2000), a case relied on by Tufts, the professor's appointment letter made clear that his faculty position was a tenure track position with "zero-base salary," which meant he would not receive any salary from the university but might receive other sources of reimbursement. There is no such language in the tenure documents of any of the plaintiffs in the instant case. In Berry v. Battey, 666 F.2d 1183, 1186 (8th Cir. 1981), also cited by Tufts, the court interpreted the 1940 statement, as adopted by the university employing the plaintiff, to not protect the plaintiff from the denial of pay raises.

Again, the issue here is significant salary and FTE cuts, not pay raises.  Moreover, the case concerned alleged violations of the First Amendment to the United States Constitution, not breach of contract.  Id. at 1184.

Thus, based on the record before us, we cannot conclude whether the economic security protection provided by the tenure contract was violated by the reductions in salary and FTE status here.  We therefore reverse the summary judgment decision in favor of Tufts on this count.

c.  Economic security and academic freedom as applied to lab space guidelines.  We turn next to the question whether the tenure commitments made by Tufts precluded it from reductions, reassignment, and closure of lab space previously assigned to the plaintiffs.

There is nothing in the tenure commitment letters guaranteeing the plaintiffs particular lab space.  The same is true for the faculty handbook, the basic science policy, and the AFTR policy.  Indeed, it is undisputed that the award of tenure does not imply a guarantee of specific lab space to a specific individual.  The plaintiffs appear, nonetheless, to suggest that a combination of economic security and academic freedom provide protection for their existing research preferences and, therefore, the lab space they have previously been provided to perform such research.  We discern no basis for concluding that

the plaintiffs' economic security is violated by Tufts's reallocation of lab space. In terms of economic security, a reduction in salary or FTE status is different, in kind and not degree, from a reallocation of lab space. While we conclude that academic freedom protects their right to pursue the research they choose to do, it does not provide them with a contractual commitment to particular university-owned lab space or even its equivalent.

As the undisputed facts establish, university-owned lab space is limited and expensive. Grants are necessary to support the expense, and securing such grants is a highly competitive process. Medical schools, including TUSM, are also under significant financial pressures. See generally White, 44 St. Louis U. L.J. at 51 ("For the last ten years, America's medical schools have endured an economic earthquake of almost unimaginable proportions"). As noted by the faculty hearing committee, given that TUSM bears the economic costs of providing and maintaining lab space, it follows that TUSM should be able to set threshold economic requirements for those seeking to use lab space for which it has already paid. Providing such lab space to those who have grants to support the use of the space, rather than those who require Tufts to incur such costs, appears to be well within the authority of Tufts to control its affairs. As this court has explained, we must be "chary about interfering

with academic decisions made by private colleges and universities" (citation and alteration omitted).  Berkowitz, 58 Mass. App. Ct. at 269.

In their briefs, the plaintiffs largely conflate the lab space guidelines with the compensation policies.  Unlike a salary reduction or a reduction in FTE status, however, a reassignment or reduction in lab space does not directly threaten the economic security of a tenured professor.  Thus, even if economic security places limits on the ability of Tufts to reduce the plaintiffs' salary or FTE status, it does not preclude Tufts from allocating limited and expensive lab space based on a faculty member's ability to recover the costs incurred in building and operating lab infrastructure.

Based on the undisputed facts in the record, Tufts has also not deprived the plaintiffs of access to lab space.  It continues to make other lab space available, and all grant submissions by the plaintiffs and other TUSM faculty include a commitment by TUSM that it will provide the appropriate resources to conduct the research.  Thus, faculty members are not deprived of the ability to secure grants, and the additional economic security they may provide.  Given these undisputed facts, we cannot conclude that the lab space reallocations and reductions at issue here violated the commitment to the plaintiffs of economic security.

Similarly, academic freedom, as defined by the tenure documents, does not prevent Tufts from reducing or transferring the lab space of faculty who fail to obtain grants. According to the tenure contract, the three components of academic freedom are (1) full freedom in research and in the publication of results, subject to adequate performance of other academic duties; (2) full freedom in the classroom; and (3) the ability to speak or write as citizens, free from institutional censorship or discipline. The latter two are clearly not implicated. See, e.g., McAdams, 2018 WI 88, ¶¶ 62-64 (discussing third component). The first, "full freedom in research and in the publication of results," does not, without more specific commitments in the tenure documents, guarantee that Tufts will provide, without reimbursement, particular lab space or its equivalent to tenured professors in the absence of grants to support payment for such space.

The case law uniformly supports such a conclusion, as courts have rejected the notion that reducing or relocating a faculty member's lab space violated academic freedom. See, e.g., Tavoloni v. Mount Sinai Med. Ctr., 26 F. Supp. 2d 678, 683 (S.D.N.Y. 1998), aff'd, 198 F.3d 235 (2d Cir. 1999); Gertler v. Goodgold, 107 A.D.2d 481, 484-485 (N.Y. 1985), aff'd, 66 N.Y.2d 946 (1985). These cases affirm the principle that "[w]hile tenure is a concept of some elasticity and, no doubt, the source

of many rights, it cannot be the wellspring of every conceivable academic amenity and privilege."  See Gertler, supra.  See also Metzger, 53 Law & Contemp. Probs. at 41-43 (discussing limitations of policy protections in regard to "financial exigencies").

Further, the AFTR policy guarantees that nontenured faculty during their probationary period will enjoy the same academic freedom that all other faculty enjoy.  Taking the plaintiffs' arguments to their logical conclusion would seem to require that TUSM also guarantee scarce lab space for nontenured faculty.

d.  Breach of the covenant of good faith.  "Every contract implies good faith and fair dealing between the parties to it.  However, the covenant does not create new rights and duties not already provided for in the contract."  (Quotation and citation omitted.)  Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 586 (2024).  "The scope of the covenant is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005).

Because the Superior Court erred in granting summary judgment to Tufts on the breach of contract claim regarding the compensation policies, we also reverse the judgment in favor of Tufts on the breach of the implied covenant claim as it relates

to the plaintiffs' compensation policies claims, as further fact finding in this regard is required.  Because we discern no basis whatsoever for the lab space guidelines claims, we do, however, affirm summary judgment on the implied covenant claim as it relates to the plaintiffs' lab space guidelines claims as well.

e.  Equitable estoppel.  The plaintiffs argue that they reasonably relied to their detriment on Tufts's representations that they would receive guarantees of tenure, including academic freedom and economic security.  We conclude that the Superior Court correctly granted Tufts summary judgment on the equitable estoppel claim.

In their appellate briefs, the plaintiffs cite no case law in support of their equitable estoppel arguments.  They merely assert that the Superior Court erroneously dismissed their equitable estoppel claim.  This does not rise to the level of appellate argument.  See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).  See also Halstrom v. Dube, 481 Mass. 480, 483 n.8 (2019) (declining to consider argument made "in a cursory fashion without citation to supporting legal authority").  Accordingly, we affirm the Superior Court's grant of summary judgment to Tufts on the equitable estoppel claim.[13]

---

[13] We also note that neither party disputes the validity of the tenure contracts at issue and the plaintiffs do not identify any promises made outside of the contracts that would support a

f.  Declaratory judgment.  Declaratory relief is "properly brought" where the plaintiff demonstrates that (1) an actual controversy exists, (2) the plaintiff has legal standing to sue, and (3) all necessary parties have been joined.  Buffalo-Water 1, LLC v. Fidelity Real Estate Co., 481 Mass. 13, 18 (2018).  A declaratory judgment is premature where a material dispute of fact remains as to the rights of the parties.  Cf. Regis College v. Weston, 462 Mass. 280, 294 (2012) (vacating declaratory judgment in favor of defendants after finding dispute of material fact remained).

Because a dispute of material fact exists as to whether the compensation policies violate the plaintiffs' contractual rights of academic freedom and economic security, we reverse the Superior Court's judgment declaring that there was no such violation.  Such a judgment was premature because the tenure rights of the plaintiffs remain uncertain.  However, because we affirm the grant of summary judgment to Tufts on the lab space claims, we affirm the portion of the judgment declaring that the

---

promissory estoppel claim.  See Loranger Constr. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 763 (1978) ("Once consideration and bargain are found, there is no need to apply [the doctrine of promissory estoppel]"); Malden Police Patrolman's Ass'n v. Malden, 92 Mass. App. Ct. 53, 61 (2017) ("Where an enforceable contract exists, . . . a claim for promissory estoppel will not lie").

lab space guidelines do not violate the plaintiffs' tenure rights.[14]

g. Wage Act claims. Given that the plaintiffs' entitlement to lost compensation has not been resolved, we do not address the plaintiffs' claims under the Wage Act, G. L. c. 149, § 148. If a fact finder concludes that the plaintiffs were not entitled to such compensation, there will be no lost wages and therefore no Wage Act claim. As resolution of this issue may be unnecessary, we do not decide it here.

3. Conclusion. For the reasons stated above, the judgment of the Superior Court is reversed, and the case is remanded, as to the plaintiffs' claims regarding the compensation policies in counts I, II, III, and IV, and the Wage Act claim in count V. We affirm the Superior Court's judgment as to the plaintiffs' lab space guidelines claims in counts I, II, and III.

So ordered.

---

[14] Tufts argues that not all necessary parties have been joined where the plaintiffs' request for declaratory judgment does not include nonparty TUSM faculty members. Based on our decision today, we need not resolve this issue. We note, however, that G. L. c. 231A, § 8, "does not require the joinder of persons who would be affected by a decision only as a precedent on an issue of law." Attorney Gen. v. Kenco Optics, Inc., 369 Mass. 412, 415 (1976).